**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Civil No. 1:25cv20902

| | |
|---|---|
| Carmen A. Halabi<br>ALCAD 1737, LTD.<br><br>Plaintiffs,<br><br>v.<br><br>Mega Bank<br><br>Defendant | Plaintiffs Demand Trial by Jury |

### COMPLAINT FOR AIDING AND ABETTING FRAUD, AND OTHER CAUSES

MAY IT PLEASE THE COURT:

COME NOW plaintiffs Carmen A. Halabi and ALCAD 1737, LTD. As their Complaint against the defendant, they most respectfully allege and pray as follows:

## I.   INTRODUCTION

I-Chen Wang. That name is forever seared into Adriana Halabi's memory. That is the criminal who robbed her father, surgeon Dr. Alfredo Halabi, of peace in his final days.

As Dr. Halabi lay on his deathbed with bills piling up, Adriana was looking for a solution. She was alone – her mother had passed, her sister was disabled, and she had no other close family. And then, in early 2024, she thought she had found that solution: someone calling themselves Carl Roberts, holding themselves out as a broker and financial expert, brought her into his online chat groups and persuaded her to invest in cryptocurrencies using an app and platform called Linuscoins. Linuscoins looked real; Adriana could see her account balance, make trades, purchase coins, etc. But, behind the façade, it was all fake.

As she will show, she was the victim of an international crime ring based in Taiwan and California. As the swindle moved along, a Taiwanese national named I-Chen Wang led her to make close to a million dollars in wire transfers to two shell companies belonging to the thieves. That money was stolen.

But I-Chen Wang, "Carl Roberts", and the scammers did not work alone. They had a willing partner in Mega Bank, a California institution that is an affiliate or subsidiary of a much larger Taiwanese bank. As the evidence will show at trial, Mega Bank knew of the scam, enabled it, and profited from it.

Indeed, there is no other conclusion. When Adriana made the first wire transfer, the recipient was a scammer shell company with an account at JP Morgan Chase. Chase immediately realized what was going on and returned the money, specifically warning of fraud. That's when the scammers turned to Mega Bank, whose parent or affiliate had been caught by New York State a few years earlier for having virtually nonexistent money laundering controls.

Mega Bank initially investigated the first transfer (and found out it was fraudulent); <u>but, then, in stark difference to Chase, Mega Bank accepted it, followed by three more</u>. This, even though it knew it was a scam because it had the same or similar tools as Chase, and in fact did investigate it. Therefore, like Chase, it found out. Indeed, it knew that its customers were newly-formed single-person shell companies with no legitimate business history, tied only to I-Chen Wang and other foreign nationals with zero connections to the United States. Even their names ("Bestova" and "Zephyrsyne") were awkward and did not suggest any commercial business. Still, Mega Bank gladly accepted four wires from the other side of the country (South Florida) exceeding $200,000 each, with no business purpose, and then let the scammers quickly close the accounts and withdraw the money.

This is not an innocent bank that simply processed transactions. Rather, it is a guilty bank that took on customers that its peers rejected because they were obviously illegitimate – and it knowingly enabled them and allowed them to destroy the Halabi family's security and Dr. Halabi's peace in his final days. This should not stand.

## II.  PERSONS AND PARTIES

1.      Plaintiff Carmen Adriana Halabi (a/k/a Carmen Adriana Halabi Zamora) ("Adriana Halabi", "Adriana", or "Ms. Halabi") is a citizen of Venezuela and a legal permanent resident of the United States domiciled somewhere other than California.

2.      Plaintiff ALCAD 1737, LTD. ("ALCAD") is an entity organized under the laws of the Federation of Saint Kitts and Nevis. Its principal place of business is in Florida.

3.      Defendant Mega Bank is an entity organized under the laws of California. It has its principal place of business in California.

4.      Non-parties Zephyrsyne Limited, Bestova Trading Limited, I-Chen Wang, Shan-Pe Wang, Mai-Ke Lin, Tsu-Hui Tien, "Carl Roberts", and John Does 1-1000 are collectively and individually identified as the "scammers", "fraudsters", "criminals", "perpetrators", or similar terms.

## III. JURISDICTION AND VENUE

5.      There is jurisdiction over the subject matter and over the parties to this suit as all the parties on either side of the suit are of diverse citizenship, and because the amount in controversy exceeds, exclusive of interest and costs, the sum of seventy-five thousand dollars ($75,000). 28 U.S.C. § 1332.

6.      Venue is proper in the U.S. District Court for the Southern District of Florida because it is where a substantial part of the events or omissions giving rise to the claim occurred. 28 U.S.C. § 1391.

7.      Venue is also proper in the U.S. District Court for the Southern District of Florida under 18 U.S.C. § 1965.

8.      Mega Bank has carried out business transactions within Florida and/or committed tortious and illegal acts within Florida, causally related to the facts asserted herein.

9.      As alleged herein, Mega Bank caused harm in Florida, to Florida persons, who were scammed out of money they kept in Florida bank accounts.

10.     Additionally, there is federal-question jurisdiction under the RICO statute, at 18 U.S.C. § 1961, *et seq.*

11.     Under federal question jurisdiction, the plaintiffs most respectfully request that this Court exercise supplemental jurisdiction over all of their state law claims. 28 U.S.C. § 1367.

## IV.   OPERATIVE FACTS

### A.     <u>The Scam</u>

12.     In early 2024, Adriana Halabi, then around 49 years old, found herself in a very difficult situation, being left all alone to handle a family crisis.

13.     Adriana had no family of her own, her mother had passed, her only sibling (her sister) had diminished mental abilities, and her father, a surgeon, was falling ill. Although relatively well-off, the family was facing debts and Adriana wanted to organize their financial lives and provide for their future. She knew her father could pass soon (which tragically did happen), and was looking for a way to provide for herself and her sister.

14.     Moreover, Dr. Halabi's worsening health condition required expensive medical treatment and was burdening the family with mounting costs.

15.     Faced with the need to pay for such treatment and assure her family's future before and after her father's passing, Ms. Halabi found herself deeply anguished, overwhelmed, alone, vulnerable, and desperate for a solution.

16.     That's when she found "Carl Roberts".

17.     Led by social media posts, she joined several WhatsApp messaging groups headed by someone calling themselves "Carl Roberts", who claimed to be a securities broker.

18.     He even had the audacity to claim that "I have served as Chief Investment Officer at Goldman Sachs, Merrill Lynch/Delegate Advisors, etc".

19.     She joined the first group on March 22, 2024, under the username or handle "AdrY H Miami".

20.     So began the plaintiffs' victimization via an elaborate and highly sophisticated investment scam apparently perpetrated by individuals in Taiwan and California.

21.     The scammers led Ms. Halabi to believe that she (on behalf of herself, her father, and plaintiff ALCAD[1]) was investing, trading, and otherwise participating in the cryptocurrency markets, when, in reality, the scammers had created a fake exchange called LinusCoins.

22.     The fake exchange even featured a fake (but realistic-looking) mobile app or portal called Linuscoins, where Ms. Halabi "traded" and performed other activities, with the screen showing false transactions and balances.

---

[1] Plaintiff ALCAD held and/or holds Halabi family investments.

23.    Over a period of months, the scammers, via WhatsApp and the fake app, reassured Ms. Halabi and ALCAD, telling them and making them believe that they were engaged in real and legitimate cryptocurrency trades and investments.

24.    This included fake depictions of real activity. For example, here is a screenshot of the app:



25.    Indeed, the app showed fake trading, fake deposits, and fake profits. In that way, the scammers led Ms. Halabi and ALCAD to believe that they were actually trading, investing, and otherwise profitably participating in the cryptocurrency markets.

26.    Behind the façade, however, no legitimate activity was taking place. Rather, the scammers were simply stealing all of the money they received from plaintiffs Ms. Halabi and ALCAD.

27.     There were also scams outside the app, though the app was the scammer's main tool.

28.     They endeavored to have Ms. Halabi download it, sign up for the fake exchange, and then transfer funds into it. Those funds were immediately stolen.

29.     The overarching scam had multiple sub-scams, such as a pump-and-dump scheme. For example, on July 8, 2024, scammer "Carl Riberts" (or "Carl Roberts") instructed his followers to do the following: "At 7:10 PM Eastern Time, everyone will collectively buy the 20% to boost the price…".

30.     Other examples:

a.      On April 30, 2024, "Carl Roberts" told Adriana that "it is expected that 300% profit can be achieved in 15 trading days" (a virtual impossibility and completely unrealistic). Adriana replied: "Perfect God helps us…I don't know how or why, but I really really trust in you. My mom died 10 years ago. I have just my sister and my dad and what I am going to show you it's all we have left we use to have more than the double, but after my mom my dad follow bankers advise and we almost going bankrupt I will sell and do and follow your advise in everything PLEASE HELP US" (emojis removed).

b.      Beginning on May 1, 2024, "Carl Roberts" began to promote the fake Linuscoins app/platform/exchange, directly instructing Adriana to download the app and sign up with an "invitation code".

c.      The next day, he falsely stated that "Linus Newly registered users have the opportunity to receive rewards ranging from $100-$800. You can follow the

changes in the funds in your account, and the funds obtained can be used for investment transactions and participation in ICOs, or can be withdrawn to any cryptocurrency exchange or to a bank account".

d.     On May 8, 2024, he told Adriana that she could withdraw money in Linus to her bank account, which turned out to be false.

e.     On May 21, 2024, he told Adriana that Linus was as secure as Kraken (a false statement since Kraken is a legitimate exchange, while Linus was a fake app and fake exchange).

f.     On July 9, 2024, he instructed as follows: "At 8:00 PM Eastern Time, everyone will collectively short-sell 20% to drive the price down…".

g.     On July 11, 2024, he told Ms. Halabi (through her father's account) that, regarding the "WLD" token, she could make a 100% profit.

h.     The following exchange on July 11, 2024:

[7/11/24, 2:06:38 PM] Carl Riberts 3: I have to say that my advice will be of great help to you. If you deposit 150k into your account, you may be able to complete the purchase of WLD
[7/11/24, 2:07:58 PM] ALF HALABI: I don't have from where to take it 😣
[7/11/24, 2:10:21 PM] Carl Riberts 3: You can liquidate all the bonds in your hands and concentrate your funds for investment. This will help you realize more profits as soon as possible. You have participated in many MMP transactions and ICOs. I believe you should know that when you have more investment costs, your profits will be Double
[7/11/24, 2:11:08 PM] Carl Riberts 3: If you can raise around 200k now to wire transfer you can complete the purchase of WLD on Saturday
[7/11/24, 2:13:20 PM] Carl Riberts 3: <attached: 00000114-PHOTO-2024-07-11-14-13-20.jpg>
[7/11/24, 2:13:59 PM] Carl Riberts 3: The WLD market price is US$1.89 and the subscription price is US$0.93, which can achieve 100% profit.
[7/11/24, 2:14:23 PM] Carl Riberts 3: This will bring you 600k profit
[7/11/24, 2:38:33 PM] ALF HALABI: Thank you. I will try my best
[7/11/24, 2:39:48 PM] ALF HALABI: But I need 400k more that I have locked and not all released invested in CRUH
[7/11/24, 2:40:19 PM] ALF HALABI: I have no more money Mr. Carl. I can't close Sabadell

i.     On August 26, "Carl Riberts 3" stated that if someone could "invest" $5 million, their daily profit could be around $500,000.

31.     On and on, the scammers manipulated Ms. Halabi and ALCAD, presenting them with fake and/or illegal strategies and trades, and making promises of wild and unrealistic gains.

32.     Based on these false representations, the scammers induced Ms. Halabi and ALCAD to make the wire transfers alleged herein.

33.     By mid-October, the fraud unraveled. The scammers told Adriana that her account was frozen, and that she needed to pay a $300,000 "fine" to unfreeze it. Soon after, she realized that it was all a scam and that her and ALCAD's money had been stolen and would not be returned.

34.     Apart from the fake app, the scammers also created a fake company and website, at https://www.skylinecpia.com.

35.     The scammers referred Ms. Halabi to that site in order to seem legitimate and gain her trust.

36.     Regarding the wire transfers that are at the core of this *Complaint*, Ms. Halabi and ALCAD (through Ms. Halabi) were told by the scammers that she could wire funds to them for deposit into the Linuscoins exchange, where she could participate in various cryptocurrency activities, including trading, investing, and participating in ICO's (initial coin offerings).

37.     This took place through long conversations on WhatsApp, including one with a purported Linus Customer Service Representative, which began on May 26, 2024.

38.     The other conversations were a long WhatsApp conversation with "Carl Roberts Broker" that began on March 22, 2024, another WhatsApp chat with "Carl Riberts 3" that began on July 8, 2024, and multiple persons in a chat called "VIP Million Investment Alliance", which Ms. Halabi joined on August 14, 2024.

39.     The statements in these WhatsApp groups led Ms. Halabi and ALCAD to believe that they were dealing with legitimate financial professionals, and that they were trading and otherwise investing in cryptocurrencies through an app called Linuscoins.

40.     For example, the scammers told Ms. Halabi the following:

        a.  "If you are a VIP user you will receive tokens within 48 hours". June 3, 2024.

        b.  That her funds would not be lost and were very safe. June 10, 2024.

        c.  That she could contact them to withdraw her funds. June 13, 2024.

        d.  That her trading orders would be carried out once she wired them money. June 15, 2024.

        e.  That she had a chance to receive more tokens. June 17, 2024.

41.     Additionally, and through the fake Linuscoins app, the scammers made multiple false statements, including showing fake trades and account balances. For example, here is a screenshot with fake balances from June 2, 2024:



42.     As a result of this fraud, the scammers obtained (stole) $250,249.99 from Ms. Halabi, and $700,500.00 from ALCAD.


**B.      Mega Bank and its Customers: Zephyrsyne and Bestova**

43.     Mega Bank was the other pillar that made the scam work.

44.     Mega Bank is a duly organized bank headquartered in California.

45.     On its LinkedIn page, it describes or described itself as follows: "Mega Bank is a Chinese American community bank opening for business in February 2008".

46.     Globally, Mega Bank is a subsidiary or affiliate of Mega International Commercial Bank, a large, publicly-traded Taiwanese bank.

47.     On December 8, 2023, an entity called Zephyrsyne Limited was formed in California.

48.     Per California corporate filings, someone called I-Chen Wang was the only person associated with the entity (at least on public filing documents) at the time of its creation.

49.     I-Chen Wang is a citizen of Taiwan.

50.     I-Chen Wang is not, and never has been, substantially present in California or anywhere else in the United States, and is not legally authorized to live or work in the United States.

51.     I-Chen Wang has no significant ties to the United States, except for scamming people in the United States.

52.     Further, the only address listed for Zephyrsyne at the time of incorporation is 155 N Lake Ave., Ste. 800, Pasadena, CA 91101.

53.     This address corresponds to shared office space available for rent and virtual offices, as advertised on the internet.

54.      Zephyrsyne is not, and never has been, engaged in any legitimate business of any kind.

55.     It is, was, and has always been a shell company created for the sole purpose of perpetrating scams, frauds, and other crimes and illegal acts.

56.     On January 18, 2024, a business entity called Bestova Trading Limited was formed in California.

57.     Per California corporate filings, I-Chen Wang is listed as the only person authorized to receive mail for Bestova, as well as its registered agent and incorporator.

58.     Further, as with Zephyrsyne, the only address listed for Bestova at the time of incorporation is 155 N Lake Ave., Ste. 800, Pasadena, CA 91101.

59.     This address corresponds to shared office space available for rent and virtual offices.

60.     Bestova is not, and never has been, engaged in any legitimate business of any kind.

61.     It is, was, and has always been a shell company created for the sole purpose of perpetrating scams, frauds, and other crimes and illegal acts.

62.     There is a website for an entity of the same name, which purports to sell clothing. However, the site is non-functional as of at least January 16, 2025, meaning it offers no way to actually purchase clothing. At most, it features a contact form and an address in California.

63.     At some point between its date of incorporation and June 5, 2024, Zephrysyne opened a commercial or corporate account with JP Morgan Chase Bank.

64.     On or around the same time period, Bestova and Zephyrsyne opened commercial or corporate accounts with Mega Bank.

65.     On, around, or before the same time period, I-Chen Wang (a/k/a Chen Wang) opened a personal account at Mega Bank.

## C.      The Wire Transfers

66.     On or around June 5, 2024, plaintiff ALCAD was induced, as part of the scam, to make a wire transfer for two hundred thousand dollars ($200,000.00) from an account at a Sabadell Bank branch in Miami-Dade to a Bestova account at Chase Bank.

67.     On the same date, Chase rejected the transfer, stating the following in a communication to Sabadell:

ATTENTION INVESTIGATIONS
REGARDING YOUR FED IMAD 0605MMQFMPYT000158 FOR
200,000.00/USD DATED 06/05/2024
ON BEHALF OF OUR SECURITY DEPT PLEASE BE ADVISED
**THIS TRANSACTION DOES NOT FIT IN THE NORMAL
PATTERN OF OUR CUSTOMER AND WE THEREFORE CONSIDER
THIS AS SUSPICIOUS**. PLEASE CHECK WITH THE REMITTER
TO CONFIRM WHETHER OR NOT THIS TRANSACTION WAS
INITIATED CORRECTLY AND WHETHER OR NOT THERE IS
**FRAUD INVOLVED**. YOUR QUICK RESPONSE WOULD BE
HIGHLY APPRECIATED BY US.
UETR REF 16BE8C70-D3ED-4258-8AF3-E117DC3F10C6
REGARDS,
**GLOBAL FRAUD PREVENTION OPERATIONS**
OUR REFERENCE JPM240605-014355
JPMORGAN
GLOBAL SOLUTIONS CENTER (866) 223-0359

(Emphasis added).

68.     Though the money was initially deducted from ALCAD's account at Sabadell, it was eventually returned because Chase rejected the transfer.

69.     On June 13, 2024, the scammers provided the details for Ms. Halabi and/or ALCAD to make a wire transfer to their Zephyrsyne account at Mega Bank.

70.     The address listed was a residential address.

71.     On June 13, 2024, and as part of the scam, Ms. Halabi was induced to attempt a wire transfer for two hundred and fifty thousand, two hundred and forty-nine dollars and ninety-nine cents ($250,249.99) to Zephyrsyne's account at Mega Bank.

72.     She sent the transfer from her personal account at Wells Fargo Bank.

73.     She personally visited a Wells Fargo branch in Miami-Dade to send the transfer.

74.     This transfer was apparently returned by the receiving bank, which may have been either Mega Bank or US Bank (on behalf of Mega Bank), because it was incorrectly sent as an overseas transfer rather than a domestic one.

75.     On June 14, 2024, and as part of the scam, Ms. Halabi was induced to attempt a wire transfer for two hundred and fifty thousand, two hundred and forty-nine dollars and ninety-nine cents ($250,249.99) to the same Mega Bank account as before, though the beneficiary was listed as "Chen Wang" rather than Zephyrsyne.

76.     At some point, I-Chen Wang or someone else connected to the scammers may have changed the name on a Mega Bank account from I-Chen Wang to Zephyrsyne Limited.

77.     On June 14, 2024, Ms. Halabi, in consultation with the scammers, was induced to contact Wells Fargo and change or attempt to change the beneficiary name to Zephyrsyne Limited.

78.     By that day or the next, the money had been withdrawn for Ms. Halabi's personal Wells Fargo account, and listed as going to "Chen Wang" as the beneficiary.

79.     On or around June 17, 2024, Mega Bank asked Wells Fargo to have Ms. Halabi provide the date of birth and, if possible, identification documents of "Chen Wang".

80.     As a matter of common knowledge, this is not the normal course of action in banking and wire transfers: for the receiving bank to have the sending bank demand personal details of the receiving bank's own customer (or beneficial owner of a corporate account).

81.     In other words, for the receiving bank to hold up a wire and investigate its own customer, and to involve the sending bank and the sender herself in the inquiry.

82.     Accordingly, Mega Bank conducted a highly unusual investigation into a wire transfer that one of its own customers was receiving, rather than simply accepting the transfer without more, as happens normally.

83.     Moreover, either Mega Bank or Wells Fargo asked for the address and date of birth of "Chen Wang".

84. As well, either Mega Bank or Wells Fargo asked Ms. Halabi if "Chen Wang" was the owner of Zephyrsyne.

85. Ms. Halabi inquired with the scammers, who sent her a copy of the picture page of a Taiwanese passport for I-Chen Wang:



86. Eventually, the wire transfer was successfully completed, with the scammers confirming on June 20, 2014 that it was deposited into the Mega Bank account.

87. This stands in stark contrast to the transfer that Chase rejected for suspicion of fraud; here, Mega Bank accepted it, despite an essentially identical transaction pattern and characteristics that had already led another financial institution to reject the transfer.

88.     Mega Bank's <u>unusual investigation</u>, <u>as well as the other facts alleged herein</u>, <u>made it unequivocally aware that it was dealing with a fraud scheme</u>.

89.     On June 24, 2024, ALCAD was fraudulently induced by the scammers to attempt to send a wire transfer for two hundred thousand dollars ($200,000) to a Zephyrstyne account at Mega Bank.

90.     The transfer was initiated by Ms. Halabi and/or her father Dr. Alfredo Halabi (RIP), acting on behalf of ALCAD.

91.     The transfer was initiated from a Miami-Dade branch of Sabadell Bank.

92.     The money was withdrawn from an ALCAD account at a Miami-Dade branch of Sabadell Bank.

93.     By June 26, 2024, the transfer had been successfully completed and received at Mega Bank.

94.     On July 1, 2024, ALCAD was fraudulently induced by the scammers to initiate a wire transfer for two hundred thousand two hundred dollars ($200,200) to a Zephyrsyne account at Mega Bank.

95.     The transfer was successful and received by Zephyrsyne at its Mega Bank account.

96.     On July 5, 2024, ALCAD made a final wire transfer from its account at Sabadell Bank to Zephyrsyne's Mega Bank account.

97.     The transfer, for three hundred thousand three hundred dollars ($300,300) was successful.

98.     At some point after that transfer, Mega Bank allowed Zephyrsyne and Bestova to close their accounts and withdraw all funds.

99.    By October 18, 2024, Ms. Halabi realized that she was being scammed. The scammers accused her of participating in malicious transactions, told her that her account was "frozen" and asked her to pay a three hundred thousand dollar ($300,000) "fine" directly to them in order to "unfreeze" the account.

100.    She did not pay, but realized that she was being scammed.

101.    Soon after, Ms. Halabi, through counsel, reported the scam to the FBI as well as other federal and state authorities.

102.    To this day, she has not heard back from the FBI or any other authorities.

103.    In summary, these were the wire transfers:

| Transfer | Date | From | To | Amount | Result |
|----------|------|------|-----|--------|--------|
| 1 | 06/05/2024 | ALCAD (Sabadell) | Bestova (Chase) | $200,000 | Rejected by Chase for suspicion of fraud. |
| 2 | 06/13/2024 | Ms. Halabi (Wells Fargo) | Zephyrsyne (Mega Bank/US Bank) | $250,249.99 | Returned due to incorrect routing number or other technical detail. |
| 3 | 06/14/2024 | Ms. Halabi (Wells Fargo) | Chen Wang and/or Zephyrsyne (Mega Bank) | $250,249.99 | Successful. |
| 4 | 06/24/2024 | ALCAD | Zephyrsyne (Mega Bank) | $200,000 | Successful. |
| 5 | 07/01/2024 | ALCAD | Zephyrsyne (Mega Bank) | $200,200 | Successful. |
| 6 | 07/05/2024 | ALCAD | Zephyrsyne (Mega Bank) | $300,300 | Successful. |

104.    Accordingly, and in total, Ms. Halabi lost, to the scammers, $250,249.99. For its part, ALCAD lost, to the scammers, $700,500.

105.    Soon after the last wire (by October 21, 2024) the Zephyrsyne account at Mega Bank had been closed and all funds had been withdrawn.

106.    Indeed, in a matter of around three weeks, Zephyrsyne at Mega Bank, received multiple six-figure wires from Ms. Halabi and ALCAD, with no accompanying invoices or contractual documents.

107.    From Mega Bank's perspective, these rapid, back-to-back inflows into a newly incorporated shell company lacked any discernible business justification, tipping it off to the fraud its customers were perpetrating.

108.    Also, starting on June 14, 2024, the scammers, as part of an attempt to have a wire go through, asked Ms. Halabi to change the beneficiary/recipient name from "Chen Wang" to Zephyrsyne.

109.    Ms. Halabi had Wells Fargo make the change by phone.

110.    Wells Fargo made Mega Bank aware of the change.

111.    Therefore, and coupled with its request for identifying information for I-Chen Wang, Mega Bank knew that there was an inconsistency or mismatch in account ownership.

112.    Yet, after obtaining these details, Mega Bank permitted the wire to post anyway, despite having confirmation that a newly formed corporate account and a private individual were effectively interchangeable beneficiaries.


### D.    Mega Bank Knew its Customers Were Engaged in Fraud

113.    As a bank, Mega Bank was subject to regulatory obligations including KYC (know-your-customer) and AML (anti-money-laundering).

114.    This means that Mega Bank had to know the identity of the beneficial owner(s) of Bestova and Zephyrsyne.

115.    Therefore, and per the available information, it knew that Bestova and Zephyrsyne were owned by, managed, and/or associated with I-Chen Wang, a citizen of Taiwan.

116.    Moreover, from California's own corporate records, Mega Bank knew that the people tied to these companies (I-Chen Wang, Shan-Pe Wang, Mai-Ke Lin, and Tsu-Hui Tien) were not legitimate businesspeople.

117.    Mega Bank also knew that Bestova and Zephyrsyne were two recently-formed companies.

118.    Mega Bank knew that Bestova and Zephyrsyne had no discernible legitimate business activity.

119.    Moreover, and as shown by Chase's rejection of the initial June 5, 2024 transfer to Bestova, banks such as Chase and Mega Bank had tools that warned them that such transactions carried a very high risk of fraud.

120.    Accordingly, like Chase, Mega Bank knew that the transactions of June 13 and 14 carried a very high risk of fraud.

121.    Therefore, Mega Bank knew that the wire of June 14 was fraudulent.

122.    This is further confirmed by the fact that Mega Bank asked Wells Fargo for the identifying details *of its own customer*.

123.    This is an unusual investigation and not the normal course of business for wire transfers.

124.    This investigation, together with the other facts herein asserted, led to Mega Bank knowing that its customers were engaged in fraud.

125.    Therefore, Mega Bank knew, by June 14, that its customers were engaged in fraud.

126.    This is further reinforced by the fact that these companies:

    a.    Were owned, managed, and/or associated with I-Chen Wang, a Taiwanese citizen with no known presence in the United States or ties to the United States;

    b.    had been founded earlier that same year and had no discernible business activities; and yet, somehow

    c.    were receiving enormous wire transfers from Florida persons and entities.

127.    Indeed, and as stated, the facts were sufficient for Chase to reject the first transfer for suspicion of fraud, and for Mega Bank to conduct an unusual investigation into the first transfer it received.

128.    Mega Bank knew that Zephysyne lacked any history of normal income or vendor relationships.

129.    Mega Bank knew that Zephysyne lacked any history of normal purchases and/or other commercial transactions.

130.    Still, even with these facts, Mega Bank not only accepted the first transfer for just over $250,000, but also three subsequent transfers totaling over $700,000.

131.    Next, it allowed its customers (who, again, consisted of newly-formed companies with no discernible legitimate business and strong overseas ties) to simply close their accounts and withdraw at least the $950,000 stolen from Ms. Halabi and ALCAD.

132.    Moreover, Mega Bank observed that the accountholder (Zephyrsyne) never submitted typical business contracts, invoices, or shipping receipts that a legitimate trading or IT

services company (which is what Zephyrsyne called itself in California corporate records) might produce.

133.    The repeated high-dollar wire transfers from individuals and entities in Florida, matched with the fast withdrawal of those funds, should have triggered further AML escalations and at least account freezes - especially after the first wire flagged by Chase for fraud.

134.    Yet Mega Bank pressed ahead, facilitating each deposit and rapid withdrawal.

135.    Mega Bank filed (or had the obligation to file) suspicious activity reports.

136.    Mega Bank carried out (or had the obligation to carry out) other anti-crime measures, including investigatory and reporting duties.

137.    Therefore, and under the facts, Mega Bank knew that its customers were engaged in fraud.

138.    Additionally and in the alternative, it must be inferred that it knew that its customers were engaged in fraud.

139.    Next, it facilitated, aided, and abetted the fraud.

140.    Additionally and in the alternative, it, at the very least, willfully blinded itself to the fraud.

141.    Mega Bank rendered substantial assistance to the fraudsters by allowing them to use its banking services.

142.    Mega Bank rendered substantial assistance to the fraudsters by provided them with the necessary financial infrastructure to perpetrate their crimes.

143.    Without Mega Bank's assistance, the scammers would have stolen a lot less money; the bank's assistance was essential.

144.     Mega Bank rendered substantial assistance to the fraudsters by allowing them to use its banking services in privileged ways, such as skipping normal and customary funds holding times, by refusing to alert the authorities of the fraud (and/or, in the alternative, suspicious transactions), allowing the criminals to rapidly close their accounts and withdraw all funds rather than freeze them or even hold them for an investigation period, and giving them discounted and/or upgraded banking features and/or services.

145.     Mega Bank allowed the fraudsters to open one or more accounts. It also allowed them to receive the wire transfers detailed herein, held the funds for them, and then allowed them to withdraw the funds and close their accounts.

146.     In addition to the above, Mega Bank maintained anti-money-laundering (AML) and due diligence programs.

147.     Under the law (31 C.F.R. § 1020.210), Mega Bank's AML program featured:

    a.     A system of internal controls to assure ongoing compliance;

    b.     Independent testing for compliance to be conducted by bank personnel or by an outside party;

    c.     Designation of an individual or individuals responsible for coordinating and monitoring day-to-day compliance;

    d.     Training for appropriate personnel; and

    e.     Appropriate risk-based procedures for conducting ongoing customer due diligence, to include, but not be limited to:

        1.     *Understanding the nature and purpose of customer relationships for the purpose of developing a customer risk profile*; and

2.      Conducting ongoing monitoring to identify and report suspicious transactions and, on a risk basis, to maintain and update customer information. For purposes of this paragraph, customer information shall include information regarding the beneficial owners of legal entity customers…

(Emphasis added).

148.    Mega Bank did, in fact, carry out and implement these programs.

149.    Mega Bank did, also, file suspicious activity reports on, before, or soon after June 14, 2024 and thereafter, regarding the scammers' activities at Mega Bank.

150.    The Zephyrsyne and Bestova accounts at Mega Bank featured the following behavior patterns, among others:

a.      Unusual transfers of funds among related accounts or accounts that involve the same or related principals.

b.      Transfer activity that is unexplained, repetitive, or shows unusual patterns.

c.      Fund transfers are sent in large, round-dollar, hundred-dollar, or thousand-dollar amounts.

d.      Frequent involvement of multiple jurisdictions or beneficiaries located in higher-risk offshore financial centers or transfers to or from institutions in higher risk jurisdictions.

e.      Companies exhibiting a high volume and pattern of funds transfers that is inconsistent with its normal business activity.

f.      Shell company accounts, with no clear legitimate purpose.

g.    Payments or receipts with no apparent links to legitimate contracts, goods, or services.

151.    These are indicators of potential fraud, and Mega Bank knew about them.

152.    Indeed, these were newly formed shell entities with no verifiable business operations, and yet Mega Bank permitted them to receive and rapidly withdraw large wire transfers, indicative of money laundering and fraud.

153.    What is more, the rapid withdrawal of funds soon after their deposit, particularly in round-dollar amounts such as $200,000, $200,200, and $300,300, is a known indicator of illicit financial activity. Mega Bank knew that a fraud was afoot.

154.    Upon information and belief, Mega Bank maintained internal records identifying Zephyrsyne Limited and Bestova Trading Limited as high-risk accounts based on their lack of legitimate business transactions, their connections to foreign entities and persons with no U.S. presence, and the significant movement of funds without corresponding commercial activity.

155.    Further, corporate records show that these entities were registered to or by I-Chen Wang, and connected to Shan-Pe Wang, Mai-Ke Lin, Tsu-Hui Tien, individuals with no substantial presence in the United States. Despite this, Mega Bank permitted these accounts to function as conduits for fraud.

156.    Upon information and belief, Mega Bank's own internal policies and compliance obligations required enhanced due diligence ("EDD") on high-risk entities, including shell corporations with foreign owners.

157.    Mega Bank did do the EDD, and therefore found out about the fraud.

158.    When Mega Bank reviewed Zephyrsyne and Bestova, it discovered that they had no physical operations, no employees, and no history of legitimate business activity - factors (in

addition to the others herein alleged) which should have made their accounts ineligible for high-value wire transactions under standard and customary banking protocols.

159.    Therefore, again, rather the freezing the accounts, Mega Bank provided them with privileged access to the financial system.

160.    Upon performing these reviews, Mega Bank became aware that these were scammer accounts.

161.    Put another way, Mega Bank did in fact perform these reviews, and therefore knew of the fraud.

162.    Through their due diligence, AML, KYC, and other compliance and investigatory programs, Mega Bank had discovered, by June 14, 2024, that Zephyrsyne, Bestova, and "Chen Wang"/I-Chen Wang were engaged in fraud.

163.    Among other facts, it knew that these were shell companies whose beneficial owners appeared to be Taiwanese citizens with no substantial links to the United States. It also knew that the companies were mere shells with no legitimate business purpose. And, it knew that they were receiving large wire transfers from across the country, which were untethered to any legitimate business activity. Finally, at some point, it received requests to withdraw all monies (almost a million dollars from the instant plaintiffs alone), from these accounts belonging to shell companies with no known legitimate business.

164.    Moreover, and upon information and belief, Mega Bank's involvement in multiple high-value transactions linked to cryptocurrency fraud is not an isolated incident but part of a broader pattern of willful blindness and even complicity and participation in illicit financial activity.

165.    Mega Bank's own records would reveal a pattern of rapid deposits and withdrawals across various accounts tied to known fraudulent actors, yet it continued processing transactions without intervention.

166.    Unlike Mega Bank, JPMorgan Chase identified the fraudulent nature of the first transaction and rejected the wire.

167.    Mega Bank just identified the fraudulent nature just as Chase did, but then accepted the wire.

168.    The fact that Mega Bank, despite having access to the same banking industry monitoring tools, did not take similar precautionary measures is evidence of knowledge, complicity, deliberate disregard, and/or willful blindness.

169.    In its incorporation documents of December 8, 2023, Zephyrsyne wrote as follows: "the purpose of the corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code".

170.    In corporate filings of December 13, 2023, Zephyrsyne listed its type of business as "Information Technology".

171.    In corporate filings of January 9, 2024, Zephyrsyne changed its type of business to "Trading".

172.    Within its California corporate documents, Zephyrsyne stated that I-Chen Wang was its Chief Executive Officer, Chief Financial Officer, Secretary, sole Director, and agent for service of process.

173.    The corporation listed no additional officers, and listed zero vacancies in its Board of Directors.

174.    Mega Bank had all of this information and knew all of this information before it received the first wire transfer.

175.    Therefore, Mega Bank knew that Zephyrsyne was a one-person corporation, that such person was a Taiwanese citizen with no known ties to the United States, and that it had listed two types of businesses (trading and information technology) in two different documents within a month.

176.    Mega Bank also knew that at least one of those businesses (trading) required state and/or federal licenses and permits.

177.    Indeed, either business (trading or information technology) would require some sort of license, permit, and/or tax documentation to legally operate.

178.    Mega Bank knew that Zephyrsyne lacked those licenses, permits, and documentation.

179.    Mega Bank also knew that I-Chen Wang lacked any relevant licenses or permits.

180.    Therefore, Mega Bank knew that Zephyrsyne could not have been involved in a legitimate trading business.

181.    Therefore, Mega Bank knew that Zephyrsyne could not have been involved in a legitimate IT business.

182.    It is also noteworthy that Mega Bank's corporate parent or affiliate, Mega International Commercial Bank of Taiwan, had to "pay a $180 million penalty and install an independent monitor for violating New York's anti-money laundering laws" in 2016, according to the New York State Department of Financial Services (link below).

183.    Indeed, per New York State's Press Release:

The fine is part of a consent order entered into with the Department of Financial Services (DFS) pursuant to which Mega Bank shall take immediate steps to correct violations, including engaging an independent monitor to address *serious deficiencies within the bank's compliance program and implement effective anti-money laundering controls*.  Mega Bank is a major international financial institution with approximately $103 billion in assets, including $9 billion at its New York branch.

"DFS will not tolerate the *flagrant disregard of anti-money laundering laws* and will take decisive and tough action against any institution that fails to have compliance programs in place to prevent illicit transactions," said Financial Services Superintendent Maria T. Vullo.  "The compliance failures that DFS found at the New York Branch of Mega Bank are *serious, persistent and affected the entire Mega banking enterprise and they indicate a fundamental lack of understanding of the need for a vigorous compliance infrastructure*. DFS's recent examination uncovered that *Mega Bank's compliance program was a hollow shell*, and this consent order is necessary to ensure future compliance."

…

Among the findings of the DFS investigation:

The BSA/AML officer for the New York branch, who was based at the bank's Taiwan headquarters, and the branch's chief compliance officer both lacked

<u>familiarity with U.S. regulatory requirements</u>. In addition, the chief compliance offer had conflicted interests because she had key business and operational responsibilities, along with her compliance role.

Compliance staff at both the head office and branch failed to periodically review surveillance monitoring filter criteria designed to detect suspicious transactions.

Also, numerous documents relied upon in transaction monitoring were not translated to English from Chinese, precluding effective examination by regulators.

The New York branch procedures provided virtually no guidance concerning the reporting of continuing suspicious activities; had inconsistent compliance policies; and *<u>failed to determine whether foreign affiliates had in place adequate AML controls</u>*.

https://www.dfs.ny.gov/reports_and_publications/press_releases/pr1608191 (emphasis added).

184.    Additionally, Mega Bank, in 2021, was fined about $360,000 by its Taiwanese regulator for lax internal controls regarding its failure to detect mortgage applications made by dummy accounts.

### E.    <u>Mega Bank Provided Substantial Assistance to the Scammers</u>

185.    Mega Bank rendered substantial assistance to the fraudsters by allowing them to use its banking services.

186.    As alleged, Mega Bank rendered substantial assistance to the fraudsters by allowing them to use its banking services with additional privileges than other customers would get at its bank, and that similarly-situated companies would get at banks in the United States in general.

187.    This consisted, at the very least, of allowing the fraudsters to open one or more accounts. It also allowed them to receive the wire transfers detailed herein, held the funds for them, and then allowed them to rapidly withdraw the funds and close their accounts.

188.    These were unusual privileges.

189.    Indeed, on or before June 14 (when Mega Bank conducted its unusual investigation into its own customers) Mega Bank, rather than following Chase's lead and returning the money, took the opposite path.

190.    That is to say, and despite knowing that the scammers were using its bank to facilitate and enable their scams, Mega Bank allowed them to receive four large transfers from Ms. Halabi and ALCAD totaling over $950,000.

191.    Indeed, after conducting its unusual investigation, Mega Bank affirmatively approved the first and subsequent transfers, despite knowing that its customers were engaged in fraud.

192.    It deposited that money, and earned fees and interest from it.

193.    It also benefitted from a substantial increase in its deposits (particularly for a small, regional bank).

194.    Therefore, and knowing that it was a scam, it allowed the scammers to store and move their money using Mega Bank, and in that way enabled them to gain access to the traditional financial system. What Chase was unwilling to do, Mega Bank was more than willing.

195.    Mega Bank's conduct was a direct cause and substantial factor in bringing about the injuries suffered by Ms. Halabi and ALCAD.

196.    As well, it was a but-for cause, adequate cause, and proximate cause.

197.    Had Mega Bank returned the funds because its customers were engaged in fraud, Ms. Halabi and ALCAD would have realized they were being scammed, and would have stopped engaging with the scammers.

198.    Had Mega Bank returned the funds because its customers were engaged in fraud, Ms. Halabi and ALCAD would have had their money returned and would not have lost it.

199.    Had Mega Bank returned the funds because its customers were engaged in fraud, Ms. Halabi and ALCAD would have gotten their money back and been unequivocally alerted to the scam, and would have therefore ceased participation in it and reported it to the authorities.

200.    Indeed, the scam might have ended completely in the United States, since the scammers might not have found a bank willing to do business with them (bearing in mind that Chase had already figured out that they were fraudsters, and Mega Bank knew but did not care).

201.    Put another way, the scammers might not have found a bank willing to do business with them, and therefore closed or severely curtailed their activities in the United States.

202.    Unlike passive banking services that merely process transactions, Mega Bank played an active role in facilitating fraud by accepting and executing wire transfers to shell companies—Zephyrsyne and Bestova.

203.    Mega Bank permitted multiple high-value transfers totaling over $700,500 to flow through these accounts despite clear indicia (and knowledge) that they were fronts for fraudulent activity.

204.    Without Mega Bank's assistance in processing these transactions, the fraud could not have succeeded, as Ms. Halabi and ALCAD relied on the ability to transfer funds under the illusion of legitimate trading on LinusCoins.

205.    Mega Bank's services were not incidental to the fraud but essential to its success. The scam's structure required that Mega Bank receive stolen funds and allow their fast withdrawal, ensuring the fraudsters could dissipate the money before detection.

206.    By approving transactions despite their known fraudulent nature, Mega Bank provided the infrastructure necessary to obscure such fraudulent nature of the transactions, thus enabling the fraud to expand and persist.

207.    Mega Bank was uniquely positioned to detect and prevent the fraudulent activity, but instead knowingly facilitated it by failing to freeze suspect accounts, halt suspicious transfers, and/or urgently report illicit transactions and/or a scam in progress.

208.    In contrast to Chase Bank—which promptly rejected a similar wire transfer—Mega Bank proceeded with the transactions, demonstrating that its actions were not merely ministerial but indicative of a conscious disregard for fraud prevention obligations.

209.    Given the facts alleged, Mega Bank should have stopped the criminals.

210.    Nonetheless, and despite receiving multiple high-value transfers from Ms. Halabi and ALCAD and processing their fast withdrawal through newly created shell accounts, Mega Bank failed to report this activity, thereby likely violating federal law.

211.    Indeed, Mega Bank ignored its obligations by permitting Zephyrsyne and Bestova to move large amounts of money without any known legitimate business purpose, source of revenue, physical operations, or transactional history, despite these being hallmarks of fraud and money laundering schemes.

212.    Mega Bank's active complicity enabled the fraud to persist.

213.    Additionally and in the alternative, Mega Bank's willful blindness enabled the fraud to persist.

## V.    CAUSES OF ACTION

### A.    <u>Aiding and Abetting Fraud</u>

214.    As herein alleged, the scammers perpetrated a fraud on Ms. Halabi and ALCAD.

215.    As herein alleged, Mega Bank had actual knowledge of the fraud that its customers were perpetrating.

216.    As herein alleged, Mega Bank substantially assisted the scammers in perpetrating the fraud.

217.    Under the facts alleged herein, Mega Bank is liable for aiding and abetting fraud.


### B.    <u>Unjust Enrichment</u>

218.    Ms. Halabi and ALCAD conferred benefits on Mega Bank.

219.    Especially, Mega Bank profited from their wires to the scammers, in the form of, for example, interest, increased lending capacity, fees, and the intangible benefits that come with expanding as a bank and having more assets and deposits under custody.

220.    These benefits were especially valuable to a small regional bank.

221.    Mega Bank knew that it was accruing these benefits, and accepted and retained them.

222.    Given that Mega Bank accepted and retained these benefits due to fraud and its complicity with it, it would be inequitable and unjust for Mega Bank to retain them.

223.   Given the Mega Bank knew of the fraud, it would be inequitable and unjust for Mega Bank to retain the benefits.

224.   Under the facts alleged herein, Mega Bank is liable for unjust enrichment.

**C.      Aiding and Abetting Breach of Fiduciary Duty**

225.   Here, the scammers, including "Carl Roberts", held themselves out as brokers and financial advisors.

226.   For this reason, Ms. Halabi and ALCAD placed their trust and confidence in them.

227.   They accepted that trust.

228.   They assumed a fiduciary duty towards Ms. Halabi and ALCAD.

229.   Then, they took advantage of that trust, abused it, and used it to steal money from Ms. Halabi and ALCAD, as herein alleged.

230.   In short, they breached their fiduciary duty towards Ms. Halabi and ALCAD.

231.   As alleged herein, Mega Bank had actual knowledge that its customers were engaged in fraud.

232.   As well, and for the same reasons, Mega Bank had actual knowledge that its customers had and were breaching their fiduciary duties.

233.   In addition, Mega Bank knew that Zephyrsyne was in some kind of (illegitimate) trading business, because it is specifically listed it in a corporate *Statement of Information* filed with the State of California on January 9, 2024.

234.   Mega Bank saw this *Statement of Information* and knew that Zephyrstyne claimed to be involved in trading.

235.    Therefore, Mega Bank knew that, as a trading company, Zephyrstyne assumed fiduciary duties towards its customers (victims).

236.    Indeed, Mega Bank had actual knowledge that I-Chen Wang, Zephyrsyne, and Bestova had no legitimate business, and yet were accepting hundreds of thousands of dollars from individuals and businesses in Miami.

237.    Mega Bank also knew that, as scammers, the criminals assumed fiduciary duties because it is inherent to the nature of scams: scammers must make victims trust them in order to steal their money.

238.    Therefore, Mega Bank knew that they had a relationship of trust, a fiduciary duty, with Ms. Halabi and ALCAD, and were breaching it.

239.    Moreover, and in light of the allegations herein, Mega Bank substantially assisted and encouraged the commission of the breach.

240.    Under the facts alleged herein, Mega Bank is liable for aiding and abetting a breach of fiduciary duty.

### D.    Intentional Infliction of Emotional Distress

241.    Since Mega Bank knew of the fraudulent scheme and aided and abetted it, its conduct was intentional and/or reckless.

242.    Moreover, it was outrageous, since it helped the scammers carry out their fraudulent scheme.

243.    This caused Ms. Halabi to suffer severe emotional distress, particularly since she, personally, lost $250,249.99.

244.     She also suffered to an extreme degree because she was already vulnerable and suffering because of her father's final illness and other burdens herein alleged.

245.     The scammers also led her to believe that she was helping her father, who was extremely sick and running up medical bills.

246.     This made the scam even more devastating.

247.     Put another way, Mega Bank, with actual knowledge, assisted an exploitative crime ring defrauding a dying father's caretaker.

248.     Ms. Halabi has suffered, is suffering, and will continue to suffer severe physical and emotional distress, including sleepless nights, intrusive thoughts, extreme worry about the future, extreme sadness, loss of enjoyment of life, and extreme anxiety, among others.

249.     Under the facts alleged herein, Mega Bank is liable for intentional infliction of emotional distress.


## E.     <u>Commercial Bad Faith</u>

250.     As alleged herein, the scammers engaged in a scheme or acts of wrongdoing.

251.     As alleged herein, Mega Bank had actual knowledge of the scheme or wrongdoing, which amounts to bad faith. It let the scammers steal almost a million dollars from Ms. Halabi and ALCAD, when it could have, like Chase, stopped it from the outset.

252.     Indeed, Mega Bank, by allowing and helping the fraudulent scheme as alleged herein, acted dishonestly and became a participant in the fraudulent scheme.

253.     Under the facts alleged herein, Mega Bank is liable for commercial bad faith.


## F.     <u>Civil Conspiracy</u>

254.     The scammers and Mega Bank entered into an agreement whereby the scammers would have the proceeds of the scam deposited in Mega Bank.

255.     Mega Bank, for its part, would earn fees and interest on the deposits, and would also benefit because its total deposits would increase.

256.     Accordingly, Mega Bank allowed the scammers to deposit stolen monies at its institution, and conduct banking activities (with additional privileges) with those monies.

257.     The scammers induced Ms. Halabi and ALCAD to wire the monies alleged above into the scammers' Mega Bank accounts, which Mega Bank accepted.

258.     As a consequence, Ms. Halabi and ALCAD lost, to theft and fraud, the amounts detailed herein.

259.     Under the facts alleged herein, Mega Bank is liable for civil conspiracy.


## G.     RICO

260.     Once Mega Bank became aware of the fraud on or before the first successful transfer of June 14, 2024, it acted with criminal intent.

261.     By accepting, profiting from, and allowing the fraudsters to ultimately withdraw (with privileges) the first and subsequent deposits, Mega Bank entered, operated, and managed, through its conduct, a mutually-beneficial criminal enterprise and pattern of racketeering activity with the scammers.

262.     Indeed, defendant Mega Bank and the scammers (including I-Chen Wang and Zephyrsyne) formed and operated an enterprise (the "Wang–Mega Conspiracy"), which functioned as a continuing unit to steal nearly $1 million from Ms. Halabi and ALCAD.

263.     This larger theft took place through multiple and repeated smaller thefts.

264.    The Wang-Mega Conspiracy operated through Mega Bank's financial infrastructure and the scammers' shell entities.

265.    This enterprise and racketeering activity lasted at least until the last monies obtained through fraud and other criminal activities were withdrawn (by October 21, 2024).

266.    Until at least that time, the enterprise functioned as a continuing unit.

267.    For example, it received and benefitted from four (4) fraudulent deposits, as described herein, from June 14, 2024 to July 5, 2024.

268.    Indeed, it effectively was a participant in the enterprise's financial dealings, since it accepted and custodied its illegal revenue.

269.    It also granted it privileged access to the financial system.

270.    It also determined the terms and conditions under which it would do so, determining the account type that the money would be held in, the standards it would be held to, the policies and procedures that would determine and govern the relationship, the interest rate, the fees it would be subject to, and many other details.

271.    Each fraudulent transfer was deposited into the Zephyrsyne account, and they were all related and demonstrated criminal conduct of a continuing nature since each was fraudulent, stolen from the same related persons (Ms. Halabi and ALCAD), via the same means (WhatsApp groups and wire transfers) stolen by the same scammers, and deposited into the same account, benefitting the same persons (the scammers -including Zephyrsyne- and Mega Bank).

272.    The common purpose of the enterprise was for Mega Bank to obtain the profits and benefits herein described (interest, fees, increased lending capacity, general business expansion through increased deposits, substantial deposit growth for a small bank, etc.), and for the scammers to directly profit from fraud and theft as herein described.

273.     As well, Mega Bank provided the scammers with "training" and valuable experience as to how to use the financial system for their crimes.

274.     Indeed, Mega Bank did not simply process the wires; it also specifically changed beneficiary names, demanded identity information (regarding its own customer) from the sending bank, declined to freeze the account, and then knowingly permitted withdrawals.

275.     By approving these critical steps, it effectively managed the flow of criminal proceeds.

276.     Fraud and theft as alleged here include, but are not limited to, wire fraud and mail fraud, as well as conversion (including when the scammers were supposedly exercising custody of the funds and property of the victims on the fake Linuscoins exchange).

277.     There are at least four instances of wire fraud: the successful wires of June 14, 2024 ($250,249.99), June 24, 2024 ($200,000), July 1, 2024 ($200,200), and July 5, 2024 ($300,300).

278.     The criminal enterprise also engaged in unlicensed money transmission and operating as a money services business, since the scammers (especially, Zephyrsyne) lacked a Florida (or California) license to operate as a money transmitter or money services business, and yet received money as a purported intermediary to transfer it to the (fake) Linuscoins exchange.

279.     As well, the scammers engaged in money laundering, since they knew that the monies received were the proceeds of unlawful activity, and yet conducted financial transactions with it, including withdrawing it from their accounts in order, at least in part, to fund ongoing criminal activity (including scams, fraud, theft, and conversion).

280.     Moreover, they instructed Ms. Halabi and ALCAD to conceal the true nature of the transfers, asking her to list at least some of them as "payment to supplier".

281.    Also, the scammers committed securities and commodities fraud, by obtaining, by false pretenses, representations, and promises, money in connection with the purchase of purported cryptocurrencies (commodities or securities).

282.    Had Ms. Halabi and ALCAD not eventually caught on, the criminal activity as to them would have continued indefinitely into the future.

283.    This is shown, among other facts, by the fact that, when the victims caught on, the scammers were requesting an additional three hundred thousand dollar ($300,000) payment, in order to "unfreeze" the victims' accounts at the fake Linuscoins exchange.

284.    This scheme presented a continued threat of repetition because the scammers had no intention of ceasing, and Mega Bank was prepared to keep processing wires for them.

285.    In sum, Mega Bank discovered the fraud with the first wire (or before), knew it was a fraud, and then actively aided its continuation by processing that first wire and the subsequent ones, and then allowing the scammers to close out their accounts and withdraw their ill-gotten gains very quickly.

286.    Like JP Morgan Chase, Mega Bank knew this was a fraud. Yet, it allowed the scammers to perpetrate it, in a mutually-beneficial enterprise.

287.    The existence of this criminal enterprise enabled its participants (the scammers and Mega Bank) to steal the monies alleged herein from Ms. Halabi and ALCAD.

## H.    Others

288.    Ms. Halabi and ALCAD assert all other causes of action assertable under the facts alleged herein. See., e. g., Johnson v. City of Shelby, Miss., 574 U.S. 10, 11–12 (2014).

## I.   LIABILITY

289.   As alleged, the scammers falsely represented to Adriana and ALCAD that they were participating in legitimate cryptocurrency investments, trading, and other transactions through, *inter alia*, an app and platform called Linuscoins.

290.   As alleged, as part of the scam, the scammers induced Adriana and ALCAD to transfer nearly $1 million to them, by telling Adriana and ALCAD that they were participating in legitimate cryptocurrency trading and investment activities.

291.   As alleged, nothing legitimate was going on; rather, the scammers stole all monies transferred to them.

292.   As alleged, Mega Bank knew of the scam, and yet did not stop it like Chase did.

293.   Instead, Mega Bank allowed and aided the scam by, at minimum, maintaining bank accounts for the known scammers (and profiting from it), and then allowing them to rapidly withdraw the money and close the accounts.

294.   Accordingly, and as alleged, Mega Bank is liable to the plaintiffs.

## J.   DAMAGES

295.   Ms. Halabi and ALCAD claim all possible damages.

296.   This includes:

a.   All monies fraudulently stolen from each.

b.   Interest.

    c.      Attorney's fees.

    d.      Treble damages.

    e.      Punitive damages.

    f.      Disgorgement and return of profits and benefits obtained by Mega Bank.

    g.      Ms. Halabi's pain, suffering, and distress.

    h.      That Mega Bank be ordered to fully cooperate with Ms. Halabi and ALCAD's attempts to find out all possible information about the scammers.

    i.      That Mega Bank be ordered to cooperate with the authorities in pursuing the scammers.

    j.      Any other remedies available under the law.

297.    As alleged, Ms. Halabi suffered direct financial losses in the amount of $250,249.99.

298.    For its part, ALCAD lost, to the scammers, $700,500.

299.    Also, Ms. Halabi experienced deep physical and psychological pain and suffering, as well as humiliation and distress, when she found out that the money was lost and that she had been scammed.

300.    This is exacerbated by the fact that her father was dying, and she was unable to help the family financially, which is why she was highly vulnerable to the scam in the first place.

301.    These physical and mental damages are estimated at no less than one million dollars ($1,000,000), plus punitive damages.

## K.  JURY DEMAND

302.    The plaintiffs demand trial by jury on all issues so triable.

**WHEREFORE**, the plaintiffs demand judgment against the defendant, as hereinbefore requested, for at least four million eight-hundred thousand dollars ($4,800,000), together with costs, interest, attorney's fees, and any other remedy allowed by law.

**I HEREBY CERTIFY** that on this same day the foregoing document was filed through the CM/ECF system, which will automatically notify the attorneys of record.

Dated: February 26, 2025

Respectfully submitted,

**Suro Rodriguez, PLLC**
Attorneys for the plaintiffs
The Wells Fargo Center
333 SE 2nd Ave.
Suite 2000
Miami, FL 33131

P.O. Box 360784
San Juan, PR  00936-0784

(786) 814-6427
surorodriguez.com

s/Miguel A. Suro
MIGUEL A. SURO
Fla. Bar No. 109587
miguel@surorodriguez.com

s/Lilyvette Rodriguez Soto
Lilyvette Rodriguez Soto
Fla. Bar No. 109563
lily@surorodriguez.com