**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 25-20902-Civ-BECERRA/TORRES

CARMEN HALABI and
ALCAD 1737, LTD., a business entity
Organized under the laws of
the Federation of Saint Kitts and Nevis,

*Plaintiffs,*

v.

MEGA BANK, *et al,*

*Defendants*.
_______________________________________/

***REPORT AND RECOMMENDATION***
***ON MOTION FOR DEFAULT JUDGMENT***

This matter is before the Court on Plaintiffs' motion for a deferred final default judgment. [D.E. 133]. Plaintiffs have additionally filed a Notice of Joint and Several Liability. [D.E. 134]. Bestova Trading Limited, Embermingle Limited, and Zephyrsyne Limited (collectively, "the Defaulted Defendants") have not responded in opposition and the time to do so has since passed. Therefore, the motion is now ripe for disposition. After careful consideration of the motion, the relevant authorities, and the record presented, Plaintiffs' motion should be GRANTED in part, DENIED in part, and DEFERRED in part.

# *I. BACKGROUND*

## *A. Procedural Background*

Plaintiffs initiated this lawsuit on February 26, 2025. [D.E. 1]. On September 5, 2025, Plaintiffs filed their First Amended Complaint ("FAC"). [D.E. 72].

On October 7, 2025, Plaintiffs filed an Unopposed Motion for Alternative Service of Process as to the Defaulted Defendants, supported by proof of non-service demonstrating that the Defaulted Defendants could not be served through conventional means. [D.E. 95]. On October 28, 2025, this Court entered an Order Authorizing Alternative Service of Process on the Defaulted Defendants. [D.E. 112]. Pursuant to this Court's October 28, 2025 Order, Plaintiffs effectuated service on each of the Defaulted Defendants through the alternative means authorized by the Court, including CA Secretary of State Service. [*See* D.E. 133-2 at ¶¶ 5, 7–12]. Each member of the Defaulted Defendants received service on November 15, 2025. Plaintiffs filed proof of service with the Court. [D.E. 123; D.E. 123-1; D.E. 123-2; D.E. 123-3]. The Defaulted Defendants did not answer the FAC or file any defending motions within the twenty-one (21) day requirement imposed by Federal Rule of Civil Procedure 12(a). On December 16, 2025, the Clerk entered default against the Defaulted Defendants for failure to plead or otherwise defend pursuant to Rule 55(a) of the Federal Rules of Civil Procedure. [D.E. 129].

The Servicemembers Civil Relief Act is inapplicable because the Defaulted Defendants are business entities, not individuals. Counsel has separately verified

that former Defendant I-Chen Wang is not in the military service of the United States. [*See* D.E. 133-2 at ¶ 15 & Attach. B].

On December 20, 2025, Plaintiffs voluntarily dismissed the individual scammer defendants—I-Chen Wang, King Cloud Information Technology Consultants, Carl Roberts (an alias), Shan-Pe Wang, Mai-Ke Lin, Tsu-Hui Tien, and the fictitious Persons and Entities 1–1000—without prejudice. [D.E. 132]. The Court ordered their dismissal on January 9, 2026. [D.E. 151]. Plaintiffs filed the present Motion on December 23, 2025. [D.E. 133].

Because the Motion asked the Court to defer entry of judgment until the claims against Mega Bank were resolved, [D.E. 133 at 12–14], the Court took no action pending that resolution. On April 27, 2026, the undersigned recommended that Mega's motion to dismiss the FAC be granted, concluding that Plaintiffs had failed to state a RICO claim or a RICO conspiracy against Mega and that the Court lacked personal jurisdiction over Mega as to the remaining counts. [D.E. 180 at 1, 75]. Judge Becerra adopted that recommendation on August 14, 2026. [D.E. 199]. Mega is no longer a party, and the Defaulted Defendants are the only defendants remaining. The Court can thus proceed to adjudicate the pending Motion.

### *B. <u>Factual Background</u>*

#### *1. Basics of the Scam*

The scheme alleged in the FAC is a species of fraud commonly called "pig butchering": the perpetrators cultivate a victim's trust over months, direct her to a counterfeit trading platform that displays fabricated balances and profits, and

harvest her deposits until she attempts to withdraw. [D.E. 72 at ¶¶ 1, 56–64]; *see also Song v. Doe*, No. 6:24-CV-809-JSS-EJK, 2024 WL 4632242, at *1 n.1 (M.D. Fla. Aug. 19, 2024) (defining "pig butchering" as a scam in which the scammer engages in a campaign to secure the victim's trust, manipulate the victim to engage in fake investments, pay out small returns to further the victims trust with the true intent to have the victim deliver larger sums as fake investments, and ultimately take the victim's money (citing A. Kimberly Dayton et al., *Advising the Elderly Client, Pig Butchering Scams* § 4:20 (2024))), *amended sub nom. Song v. Defendant 1*, No. 6:24-CV-809-JSS-EJK, 2024 WL 4606067 (M.D. Fla. Oct. 29, 2024).

The Defaulted Defendants are the corporate vehicles through which the scheme moved money. Zephyrsyne Limited and Embermingle Limited were formed in California on December 8, 2023; Bestova Trading Limited followed on January 18, 2024. [D.E. 72 at ¶¶ 82, 84, 94]. I-Chen Wang, a citizen of Taiwan who has never been substantially present in the United States, is the only person listed on Zephyrsyne's formation documents, is Embermingle's CEO, CFO, and Secretary, and is Bestova's registered agent and incorporator. [*Id.* at ¶¶ 83, 85, 87–88, 95]. All three list the same address at incorporation—155 N Lake Ave., Ste. 800, Pasadena, California—which corresponds to rented shared and virtual office space. [*Id.* at ¶¶ 90–91, 96–97]. None has ever conducted legitimate business. [*Id.* at ¶¶ 92–93, 98–99, 104]. On or about January 19, 2024, Wang opened accounts for Zephyrsyne and Embermingle at Mega Bank; Zephyrsyne and Bestova also opened accounts elsewhere. [*Id.* at ¶¶ 101–03, 289].

### *2. Luring*

In early 2024, Carmen Halabi was caring for her father, Dr. Alfredo Halabi, a surgeon who was gravely ill and whose treatment was generating mounting costs. [*Id.* at ¶¶ 48–50]. Her mother had died, her only sibling had diminished mental capacity, and she was, as the FAC puts it, "deeply anguished, overwhelmed, alone, vulnerable, and desperate for a solution." [*Id.* at ¶ 51].

On March 22, 2024, drawn by social media posts, Halabi joined a WhatsApp group run by a person calling himself "Carl Roberts," who claimed to have "served as Chief Investment Officer at Goldman Sachs, Merrill Lynch/Delegate Advisors, etc." [*Id.* at ¶¶ 53–55]. Over the following months "Roberts" and his associates promised extraordinary returns: on April 30, 2024, that "it is expected that 300% profit can be achieved in 15 trading days"; on August 26, that a $5 million investment would yield roughly $500,000 per day. [*Id.* at ¶ 66(a), (i)]. Halabi replied to the April 30 message by explaining that what she was about to show him was "all we have left," and asking him to "PLEASE HELP US." [*Id.* at ¶ 66(a)].

Beginning May 1, 2024, "Roberts" directed Halabi to download the LinusCoins application and register with an invitation code, and represented that the platform was as secure as Kraken, that funds could be withdrawn to a bank account at will, and that new users received rewards. [*Id.* at ¶ 66(b)–(e)]. The scammers also built a fake corporate website and referred Halabi to it to appear legitimate. [*Id.* at ¶¶ 70–71]. The application displayed fabricated trades, deposits, and profits. [*Id.* at ¶¶ 58, 61, 77]. Behind it, nothing was real. [*Id.* at ¶ 62].

### *3. Crimes Committed in Furtherance of the Scam*

The FAC alleges four completed wire transfers induced by these misrepresentations, each sent from a Florida account to Zephyrsyne's account at Mega Bank: $250,249.99 from Halabi's personal Wells Fargo account on June 14, 2024; $200,000.00 from ALCAD's Banco Sabadell account on June 24, 2024; $200,200.00 from the same ALCAD account on July 1, 2024; and $300,300.00 on July 5, 2024. [*Id.* at ¶¶ 114, 129, 134, 136–37, 143]. Two earlier attempts failed: a $200,000.00 ALCAD transfer to a Bestova account at JPMorgan Chase on June 5, 2024, which Chase rejected as "suspicious" and possibly fraudulent, and a June 13, 2024 Halabi transfer returned for a routing defect. [*Id.* at ¶¶ 105–07, 110, 113, 143].

The scammers also directed Halabi to misdescribe the transfers, instructing her to designate at least some as "payment to supplier." [*Id.* at ¶ 389]. When the receiving bank questioned the transactions, Wang supplied documents the FAC characterizes as facially false: an invoice reflecting Halabi's purchase of 1,000 t-shirts at over $86 each, and a warehouse address that was in fact a single-family residence. [*Id.* at ¶¶ 318–19, 340]. The FAC further alleges that the enterprise operated as an unlicensed money transmitter, neither Florida nor California having licensed Zephyrsyne to receive funds as an intermediary, [*id.* at ¶ 387], and that the scammers committed securities and commodities fraud by obtaining money by false pretenses in connection with purported cryptocurrency purchases, [*id.* at ¶ 390].

### *4. Money Laundering*

Separately from the wires, Halabi was induced to transfer 150.25 Ether, valued at approximately $554,822.00 at the time of transfer, in fifteen transactions between May and September 2024, sent from her Kraken account to wallet addresses the scammers supplied. [*Id.* at ¶¶ 256–57; D.E. 133-1 at ¶ 8].

The FAC traces what followed. The digital assets moved through numerous intermediary addresses under the scammers' common control, an obfuscation technique the FAC identifies as "layering." [D.E. 72 at ¶ 258]. The scammers then employed a "peel chain," successively peeling small amounts from the larger sum and cashing them out through exchanges. [*Id.* at ¶ 259]. Portions of the Ether were swapped for Tether through the Tokenlon exchange, and assets attributable to Halabi's transfers were ultimately deposited at Binance, Coinbase, Crypto.com, FixedFloat, Kraken, OKX, Robinhood, Shakepay, and Uphold. [*Id.* at ¶¶ 260–61]. Transfers 6, 11, and 12 have not been fully traced. [*Id.* at ¶¶ 267, 270].

The wired funds moved as well. Between June 20 and July 9, 2024, Zephyrsyne wired at least $160,000.00, $60,000.00, $210,000.00, $180,000.00, and $300,000.00 to an account held by King Cloud Information Technology Consultants in Dubai, supported by invoices for purported information-technology services. [*Id.* at ¶¶ 323, 341]. By August 21, 2024, the Zephyrsyne account was closed and substantially all funds had been withdrawn. [*Id.* at ¶¶ 138, 146, 374].

### *5. Aftermath of the Scam*

By mid-October 2024 the scheme collapsed of its own weight. The scammers told Halabi her account had been frozen and demanded a $300,000.00 "fine" to release it. [*Id.* at ¶¶ 69, 139]. She refused, and on or about October 18, 2024 realized that she had been defrauded. [*Id.* at ¶¶ 139–40; D.E. 133-1 at ¶ 10]. Nothing has been returned. [D.E. 133-1 at ¶ 10].

Halabi reported the scheme to the Federal Bureau of Investigation and to other federal and state authorities through counsel; she claims has never heard back. [D.E. 72 at ¶¶ 141–42]. The FAC alleges that the enterprise did not stop. It identifies at least one other victim, Molly DaSilva of Washington State, who wired $248,000.00 into the Zephyrsyne account on July 16, 2024 and was unable to rescind the transfer before the scammers withdrew the funds. [*Id.* at ¶¶ 363–65]. And Plaintiffs allege that the same or related scammers have continued to solicit Halabi through new WhatsApp groups since she discovered the fraud. [*Id.* at ¶¶ 417–18, 429; D.E. 133-1 at ¶ 12].

## *II. APPLICABLE PRINCIPLES*

Federal Rule of Civil Procedure 55 prescribes a two-step process for obtaining a default judgment. First, when a defendant fails to plead or otherwise defend a properly served complaint, the plaintiff must make an evidentiary showing by affidavit or otherwise and request that the clerk enter a default. Fed. R. Civ. P. 55(a). Upon a compliant submission, the clerk must enter the party's default. *Ibid.* Second, after the clerk enters the default, the plaintiff must apply to the Court for a default

judgment. Fed. R. Civ. P. 55(b). "The effect of a default judgment is that the defendant '…admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus established.'" *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987) (quoting *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)).

The Court does not grant a default judgment merely because the plaintiff has followed the proper procedures. It must also ensure that the complaint makes well-pleaded allegations upon which the Court has the power to grant relief. *United States v. Kahn*, 164 F. App'x 855, 858 (11th Cir. 2006). A default judgment is unassailable on the merits, but only so far as it is supported by well-pleaded allegations, assumed to be true. *Nishimatsu*, 515 F.2d at 1206 (citing *Thomson v. Wooster*, 114 U.S. 104 (1885)). A well-pleaded complaint is one that is plausible on its face, offering more than conclusory assertions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Eleventh Circuit has put it this way: because entry of default judgment is warranted only where there is "a sufficient basis in the pleadings for the judgment entered," and because that standard is "akin to that necessary to survive a motion to dismiss for failure to state a claim," a "motion for default judgment is like a reverse motion to dismiss for failure to state a claim." *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015) (per curiam). The Defaulted Defendants' silence therefore relieves Plaintiffs of the burden of proving their allegations; it does not relieve them of the burden of stating a claim.

If the Court concludes that the complaint passes muster, it must then "conduct an inquiry to ascertain the amount of damages." *PetMed Express, Inc. v. MedPets.com, Inc.*, 336 F. Supp. 2d 1213, 1217 (S.D. Fla. 2004). "Damages may be awarded only if the record adequately reflects the basis for award via 'a hearing or a demonstration by detailed affidavits establishing the necessary facts.'" *Adolph Coors Co. v. Movement Against Racism & the Klan*, 777 F.2d 1538, 1544 (11th Cir. 1985) (quoting *United Artists Corp. v. Freeman*, 605 F.2d 854, 857 (5th Cir. 1979) (per curiam)). Rule 55 does not require an evidentiary hearing on the amount of damages, and whether to hold one lies within the Court's discretion. *See SEC v. Smyth*, 420 F.3d 1225, 1232 n.13 (11th Cir. 2005). Plaintiffs have attached sufficient declaratory and documentary evidence to permit the Court to ascertain the appropriate damages without an additional hearing.

## *III. ANALYSIS*

Plaintiffs seek a final default judgment on Counts A, B, C, and D (RICO), [D.E. 72 at ¶¶ 274–449], Count F (Unjust Enrichment), [*id.* at ¶¶ 454–63], Count H (Intentional Infliction of Emotional Distress), [*id.* at ¶¶ 480–89], Count I (Civil Conspiracy), [*id.* at ¶¶ 490–97], Count J (Fraud), [*id.* at ¶¶ 498–506], Count K (Conversion), [*id.* at ¶¶ 507–09], Count L (Breach of Fiduciary Duty), [*id.* at ¶¶ 510–15], and Count M (Constructive Trust and Disgorgement), [*id.* at ¶¶ 516–22]. [D.E. 133 at 14]. Each Count is pleaded in the FAC and asserted against the Defaulted Defendants. We must then address subject matter jurisdiction, personal jurisdiction, the Motion's request for deferral, liability, and damages in turn.

### *A. The Court Has Subject Matter Jurisdiction Over All Claims*

This Court has federal question jurisdiction over Plaintiffs' RICO claims. *See* 18 U.S.C. § 1964(c); 28 U.S.C. § 1331. It may exercise supplemental jurisdiction under 28 U.S.C. § 1367 over the state law claims, which arise from the same nucleus of operative facts, namely the fraudulent inducement of Plaintiffs' transfers and the disposition of the proceeds. [D.E. 72 at ¶ 47]; *see, e.g., Licea v. Curaçao Drydock Co.*, 584 F. Supp. 2d 1355, 1358 (S.D. Fla. 2008).

### *B. The Court Has Personal Jurisdiction Over The Defaulted Defendants*

Personal jurisdiction over the Defaulted Defendants is proper under 18 U.S.C. § 1965(a) and (b), and under Florida's long-arm statute, Fla. Stat. § 48.193(1)(a)(2), which reaches a defendant who commits a tortious act within the state. Venue lies under 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claims occurred in this District.

The well-pleaded allegations establish the requisite minimum contacts. The Defaulted Defendants and their associates reached into Florida to solicit Halabi, [D.E. 72 at ¶¶ 53–55], maintained contact with her here over roughly seven months, [*id.* at ¶¶ 66, 73–76], and induced four wire transfers initiated at Miami-Dade branches of Wells Fargo and Banco Sabadell, [*id.* at ¶¶ 112, 117, 131–32, 136]. Zephyrsyne received each of those transfers. The injury was suffered in Florida, by a Florida-domiciled plaintiff and a Florida-headquartered entity. [*Id.* at ¶¶ 1–3, 42–45].

This conclusion is not in tension with the Court's determination that Mega Bank lacked sufficient contacts with Florida. *See* [D.E. 180 at 61–75]. The distinction the Court drew there is precisely the one that governs here: "The Scammers, not Mega, targeted Plaintiffs," and "the Scammers recruited Florida and St. Kitts victims and induced them to wire funds to California." [*Id.* at 67]. Mega's contacts were those of a passive recipient bank; the Defaulted Defendants' were those of the solicitors of the fraud. And, if the RICO claim is ultimately sustained, the Defaulted Defendants would also be subject to personal jurisdiction here under RICO's nationwide service provision. The same could not be said of Mega.

### *C. The Motion's Request for Deferral Is Moot*

The Motion does not ask for immediate entry of judgment. Invoking *Frow v. De La Vega*, 82 U.S. (15 Wall.) 552 (1872), Plaintiffs asked the Court to fix liability but defer entry of final judgment until the claims against Mega Bank were resolved, so as to avoid inconsistent adjudications. [D.E. 133 at 12–14]. Plaintiffs also filed the Notice of Joint and Several Liability that Judge Becerra's standing order requires. [D.E. 134].

*Frow* holds that "a final decree on the merits against the defaulting defendant alone, pending the continuance of the cause, would be incongruous and illegal." 82 U.S. at 554 (Bradley, J.). The Eleventh Circuit has not confined that principle to defendants who are jointly liable in the strict sense. In *Gulf Coast Fans, Inc. v. Midwest Electronics Importers, Inc.*, the court extended it to defendants who are "similarly situated, but not jointly liable," reasoning that "[i]t would be incongruous

and unfair to allow [the plaintiff] to collect . . . on a contract that a jury found was breached by [the plaintiff].” 740 F.2d 1499, 1512 (11th Cir. 1984).

Events have overtaken the request. Mega is no longer a party. [D.E. 199]. There is accordingly no parallel proceeding whose outcome could be contradicted, and the premise of the deferral request has dissolved.

More importantly, nothing about Mega’s dismissal makes a judgment against the Defaulted Defendants “incongruous.” *Gulf Coast Fans* withholds judgment where the non-defaulting defendant prevails on a defense that the defaulting defendant shares. Mega prevailed on no such defense. The Court’s reasoning was Mega-specific throughout: it held that “none of Mega’s alleged wrongful acts evidence operation or management of a RICO enterprise,” and that no agreement between Mega and the scammers had been pleaded. [D.E. 180 at 26]. It expressly declined to disturb the allegations against the scammers themselves, observing that “the FAC has gone into great detail and specificity in weaving a tale of fraud on the part of the Scammers, but only negligence or breach of duties on the part of Mega,” [*id.* at 38], and that “the FAC’s allegations draw only one inference: that Mega, like the Plaintiffs, was taken for a ride by the Scammers,” [*id.* at 38]. The counts asserted against the scammers alone were catalogued but never analyzed, because Mega’s motion did not reach them. [*Id.* at 10–11]. A defendant dismissed because he was himself a victim of the fraud is not “similarly situated” to the defendants who committed it.

### *D. Plaintiffs Are Entitled To A Default Judgment On All Claims Against The Defaulting Parties*

#### *1. Cause of Action A, B, C, D (Federal RICO)*

A plaintiff suing under the civil provisions of RICO must plausibly allege six elements: "that the defendants (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two predicate acts of racketeering, which (5) caused (6) injury to the business or property of the plaintiff." *Otto Candies, LLC v. Citigroup Inc.*, 137 F.4th 1158, 1196 (11th Cir. 2025) (quoting *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020)); *see also Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1066 (11th Cir. 2017) (stating the same requirements as "(1) a violation of 18 U.S.C. § 1962; (2) injury to business or property; and (3) causation"); *Ray v. Spirit Airlines, Inc.*, 767 F.3d 1220, 1224 (11th Cir. 2014); *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290–91 (11th Cir. 2010) ("In order to prove a pattern of racketeering in a civil or criminal RICO case, a plaintiff must show at least two racketeering predicates that are related, and that they amount to or pose a threat of continued criminal activity." (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989))).

*a) The RICO Enterprise*

A RICO enterprise is "an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). It may consist of "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]" 18 U.S.C. § 1961(4). A

critical commonality among every enterprise is that its members share "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009) (Alito, J.) (citing *Turkette*, 452 U.S. at 583). Plaintiffs must show "evidence of an ongoing organization, formal or informal, and . . . evidence that the various associates function as a continuing unit." *Id.* at 945 (quoting *Turkette*, 452 U.S. at 583). Those features need not be proved by evidence separate from the pattern of racketeering; the two "may in particular cases coalesce." *Id.* at 947.

An enterprise does not require a nerve center; it is not defined by formal hierarchies, such as commanders or associates. *Id.* at 948. An "association in fact" is necessarily expansive. *Id.* at 944; *see* also *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497–98 (1985) (White, J.) ("RICO is to be read broadly."); *Ray,* 767 F.3d at 1227 ("[C]ivil RICO targets a broad category of criminally fraudulent acts . . . ."). A shared purpose to engage in illegal activity is the initial spark that sets an enterprise in motion. *Al-Rayes v. Willingham*, 914 F.3d 1302, 1308 (11th Cir. 2019); *see also Almanza*, 851 F.3d at 1074 (refusing to find an enterprise where the alleged associates had not shared a meeting of the minds).

The "purpose" must satisfy additional requirements to build a RICO enterprise. It must affect interstate commerce, 18 U.S.C. § 1962(c), and it must be specific, not abstract or general, *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020) ("An abstract common purpose, such as a generally shared interest in making money, will not suffice."); *see also Ray,* 836 F.3d at 1352 n.3 ("[S]ince making

money is the purpose of every for-profit corporation, at least based on these pleadings, this purpose is wholly insufficient to establish an association-in-fact enterprise."). If the purpose is to enrich the enterprise's members, it must be "through a particular criminal course of conduct." *Cisneros*, 972 F.3d at 1211 (citing *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1284–85 (11th Cir. 2006)). The racketeers must try to achieve a certain end through certain criminal activities. *See, e.g., Lewis v. Mercedes-Benz USA, LLC*, 530 F. Supp. 3d 1183, 1216 (S.D. Fla. 2021) ("Establishing a shared purpose requires more than alleging that all members of an enterprise acted in parallel and independently harbored a common improper motive. Rather, a plaintiff must allege, with enough factual detail, that members of the enterprise were actively collaborating to achieve that improper motive.").

If a plaintiff can establish that certain defendants established a criminal enterprise, then he has shown that the defendants came together to achieve a shared identifiable goal through a shared and identifiable criminal purpose.

Plaintiffs allege that the Defaulted Defendants conspired with (now terminated Defendant) I-Chen Wang to enrich the enterprise by defrauding victims, such as Plaintiffs, using "wire fraud, money laundering and other predicate offenses." [D.E. 72 at ¶¶ 274–80]. The FAC pleads the following individuals as associated with the Defaulted Defendants: Mai-Ke Lin, "Carl Roberts" (an alias), Tsu-Hui Tien, I-Chen Wang, and Shan-Pe Wang (collectively, "the Terminated Defendants"). [*Id.* at ¶¶ 9–13, 159, 201, 431]. Each of those individuals has been dismissed in an individual capacity, [D.E. 132; D.E. 151], but their dismissal does not subtract from what the

Defaulted Defendants have admitted. A default admits the well-pleaded factual allegations of the complaint, *Buchanan*, 820 F.2d at 361, and the allegations describing the Terminated Defendants' conduct are part of the factual matter the Defaulted Defendants have admitted as against themselves. Nothing in the voluntary dismissal purported to adjudicate those facts. Moreover, an association-in-fact enterprise may include participants who are not parties at all; here, "Carl Roberts" and the unidentified operators of the LinusCoins platform. [D.E. 72 at ¶¶ 422(b), (e), 426(f)]. On these pleadings, the Scammer Enterprise pleaded in Counts C and D comprises persons sharing a common, concrete, and criminal purpose, as § 1962 requires.

*b) <u>Conducting the Affairs of the Enterprise</u>*

"To conduct or participate, directly or indirectly, in the conduct of such [an] enterprise's affairs," as required under 18 U.S.C. § 1962(c), "one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (holding that accounting firm for a farmer's cooperative sued by purchasers of demand notes did not "participate in the operation or management" of the cooperative's affairs, as required to impose liability for accountants under RICO).

The operation-or-management test does not confine liability to those at the top. *Reves* itself explains that "[a]n enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management." 507 U.S. at 184. The Eleventh Circuit has applied that understanding: "the defendant need not occupy a leadership position in order to be

associated with the enterprise; lower rung participants and outsiders who conduct the affairs of the enterprise may be associated with the enterprise as well." *United States v. Starrett*, 55 F.3d 1525, 1551 (11th Cir. 1995) (per curiam).

Measured against that standard, the pleadings amply suffice as to the Defaulted Defendants. They are not alleged to have been bystanders to the enterprise; they are alleged to have been its instruments. Each was formed for no purpose other than to perpetrate the scheme. [D.E. 72 at ¶¶ 92–93, 98–99, 104]. Zephyrsyne opened and maintained the account that received every completed transfer, [*id.* at ¶¶ 102, 143], furnished the fabricated invoices and the false warehouse address that kept the receiving bank at bay, [*id.* at ¶¶ 318–19, 371], and wired the proceeds onward to Dubai, [*id.* at ¶¶ 323, 341]. Bestova opened the account that received the first attempted transfer. [*Id.* at ¶¶ 101, 105]. Embermingle's account was used to victimize others. [*Id.* at ¶ 305]. Wang, who controlled all three, dealt directly with the receiving bank on the enterprise's behalf. [*Id.* at ¶¶ 315, 317, 325, 327].

Two qualifications bear noting. First, the enterprise alleged in Counts A and B—the "Wang-Mega Conspiracy"—is not a viable predicate for this Motion. The Court has already determined that the FAC does not plausibly plead an agreement between Mega and the scammers, and recommended that those counts be dismissed as to Mega on that basis. [D.E. 180 at 25–39, 75–76]. An association-in-fact enterprise defined by reference to a member who is not plausibly alleged to have joined it cannot

supply the enterprise element. The Scammer Enterprise pleaded in Counts C and D, by contrast, does not depend on Mega at all. [D.E. 72 at ¶¶ 414–29].

Second, the "person" sued under § 1962(c) must be distinct from the enterprise. *See United States v. Goldin Indus., Inc.*, 219 F.3d 1268, 1270–71 (11th Cir. 2000) (en banc). That requirement is satisfied: each Defaulted Defendant is a distinct legal entity, and the Scammer Enterprise is an association-in-fact comprising those entities together with Wang, "Carl Roberts," King Cloud, and others. *See United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1275 (11th Cir. 2000) ("the definitive factor in determining the existence of a RICO enterprise is the existence of an association of individual entities, however loose or informal, that furnishes a vehicle for the commission of two or more predicate crimes").

*c) The Pattern of Racketeering Activity*

"[T]he heart of any RICO complaint is the allegation of a pattern of racketeering." *Agency Holding Corp. v. Malley-Duff & Assocs.*, 483 U.S. 143, 154 (1987) (O'Connor, J.); *Boyle*, 556 U.S. at 950 ("Section 1962(c) demands much more: the creation of an 'enterprise'—a group with a common purpose and course of conduct—and the actual commission of a pattern of predicate offenses."); 18 U.S.C. § 1962(c). A pattern requires at least two acts of racketeering activity within ten years. 18 U.S.C. § 1961(5). But two acts are a floor, not a definition: the predicates must also be related to one another and must "amount to or pose a threat of continued criminal activity." *H.J. Inc.,* 492 U.S. at 239 (1989) (Brennan, J.); *see Boyle*, 556 U.S. at 949 ("[P]roof that a defendant conspired to commit a RICO predicate offense—for

example, arson—does not necessarily establish that the defendant participated in the affairs of an arson enterprise through a pattern of arson crimes.").

Relatedness is readily satisfied here. The alleged predicate acts share "the same or similar purposes, results, participants, victims, [and] methods of commission." *H.J. Inc.*, 492 U.S. at 240 (quoting 18 U.S.C. § 3575(e)). Every transfer was induced by the same misrepresentations, made by the same actors through the same channels, and deposited into accounts controlled by the same persons. [D.E. 72 at ¶ 380]. The FAC identifies at least four discrete acts of wire fraud, [*id.* at ¶ 386], together with money laundering, transportation of stolen property, and securities and commodities fraud, [*id.* at ¶¶ 388, 390, 420].

Continuity is the harder question, and on the present record we are unwilling to resolve it. Five months ago, in this same case, the Court held that closed-ended continuity requires "a 'closed period repeated conduct' spanning more than a year," [D.E. 180 at 35 (quoting *Otto Candies,* 137 F.4th at 1198)], and that the Eleventh Circuit "measure[s] a 'substantial period of time' in years, not in weeks," [*id.* at 36 (quoting *Cisneros*, 972 F.3d at 1216)]. It further held that "single schemes with a specific objective and a natural ending point can almost never present a threat of continuing racketeering activity." [*Id.* (quoting *Ferrell v. Durbin*, 311 F. App'x 253, 257 (11th Cir. 2009))]. Applying that framework, the Court concluded that the window pleaded in the FAC failed both branches. [*Id.* at 37–39].

The Scammer Enterprise is pleaded over a longer arc than the Wang-Mega Conspiracy was—December 8, 2023 through October 2024, which the FAC itself

describes as "at least 10 months," [D.E. 72 at ¶ 446]—but that is still short of the year the Court has said is required. So closed-ended continuity may pose an obstacle even as to the Scammer Enterprise.

But Plaintiffs may well have the better of the open-ended argument. Unlike Mega, whose participation had a natural terminus when its own compliance system forced the accounts closed, the Scammer Enterprise is alleged to be operating still, to have taken at least one other victim, and to have continued soliciting Halabi after she discovered the fraud. [*Id.* at ¶¶ 363–65, 417–18, 429; D.E. 133–1 at ¶ 12]. But Plaintiffs have not made that argument nor provided any support for it. The Motion devotes a single sentence to continuity, [D.E. 133 at 7], and it was filed four months before the Court's ruling, so it says nothing about it.

We decline to supply the argument ourselves. A motion for default judgment is "like a reverse motion to dismiss for failure to state a claim," *Surtain*, 789 F.3d at 1245, and the Court's obligation to test the sufficiency of the pleadings is not relaxed because no one is contesting them. Nor should a single case yield inconsistent constructions of the same requirement five months apart. We therefore recommend that the Court defer ruling on Counts A, B, C, and D. If Plaintiffs wish to continue their efforts at obtaining a default judgment that includes RICO liability against the Defaulted Defendants, then Plaintiffs should file a supplemental memorandum addressing continuity—closed-ended and open-ended—as to the Scammer Enterprise, and addressing the effect, if any, of the Court's April 27, 2026 Report and Recommendation on that analysis.

*d) <u>Injury to business or property due to RICO violations</u>*

Section 1964(c) confers a right of action on "[a]ny person injured in his business or property by reason of a violation of section 1962." The injury must be direct. *See Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992) (Souter, J.) (requiring "some direct relation between the injury asserted and the injurious conduct alleged"); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006) (Kennedy, J.).

That requirement poses no difficulty here. Plaintiffs are not derivative victims complaining of harm visited on someone else; they are the persons from whom the money was taken. The scammers induced them to transfer funds and cryptocurrency by misrepresenting LinusCoins as a functioning exchange, and then converted what they received. [D.E. 72 at ¶¶ 48–78, 256–73]. The loss is the direct and intended consequence of the racketeering alleged, and it exceeds $1.5 million.

The aggregate loss is not in dispute on this record. Its allocation between the two Plaintiffs is. The Halabi Declaration assigns Halabi the June 14, 2024 wire of $250,249.99 from her personal Wells Fargo account and the 150.25 Ether, and assigns ALCAD the $700,500.00 in wires from its Banco Sabadell account. [D.E. 133-1 at ¶¶ 6–9]. But the Court has already noted that Halabi's November 26, 2025 deposition "clarifies that Halabi's account served merely as a pass-through vehicle for Plaintiff ALCAD 1737, LTD.," [D.E. 180 at 5], and has expressly reserved "a dispute over standing to sue for the trust's losses, a dispute we do not adjudicate here," [*id.* at 3 n.4.]

We need not adjudicate it either. Both Plaintiffs are before the Court, both assert every count, and the Defaulted Defendants are alleged to be jointly and severally liable for the whole. Whether a given dollar belonged to Halabi or to ALCAD when it left Florida does not change what the Defaulted Defendants took or what they owe. We therefore recommend that if ultimately a RICO judgment is entered, it should run in favor of Plaintiffs jointly, and that the allocation between them be reserved.

### *2. Cause of Action F (Unjust Enrichment)*

Under Florida law, the elements of unjust enrichment are "(1) the plaintiff has conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for the defendants to retain it without paying the value thereof." *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1337 (11th Cir. 2012) (quoting *Fla. Power Corp. v. City of Winter Park*, 887 So. 2d 1237, 1241 n.4 (Fla. 2004)).

Here, the analysis diverges among the three Defaulted Defendants, because the first element asks what each defendant received.

Zephyrsyne received all of it. Every completed wire—$250,249.99 on June 14, $200,000.00 on June 24, $200,200.00 on July 1, and $300,300.00 on July 5, 2024—was deposited into Zephyrsyne's account. [D.E. 72 at ¶¶ 114, 129, 134, 136–37, 143; D.E. 133-1 at ¶¶ 6–7]. It accepted and retained those funds knowingly, [D.E. 72 at ¶¶ 456, 459], gave nothing in return, [D.E. 133-1 at ¶ 11], and wired the proceeds onward to Dubai before the account was closed, [D.E. 72 at ¶¶ 323, 341, 374]. Retention of

$950,749.99 obtained by deceit is inequitable by any measure. The elements are satisfied as to Zephyrsyne.

They are not satisfied as to Bestova or Embermingle. The only transfer directed to Bestova—the $200,000.00 sent on June 5, 2024—was rejected by JPMorgan Chase as suspicious and returned to ALCAD. [*Id.* at ¶¶ 105–07]. Bestova therefore received no benefit from Plaintiffs at all. Embermingle's account is alleged to have been used to defraud other victims, [*id.* at ¶ 305], but the FAC does not allege that any of Plaintiffs' money passed through it. As for the 150.25 Ether, the FAC attributes the receiving wallets to "the scammers (I-Chen Wang, 'Carl Roberts', and Persons and Entities 1–1000)," [*id.* at ¶ 257], and the Halabi Declaration to addresses "provided by the Defaulted Defendants and/or their co-conspirators," [D.E. 133-1 at ¶ 8]—neither of which places the cryptocurrency in the hands of any particular Defaulted Defendant.

A benefit conferred on a co-conspirator is not a benefit conferred on the defendant. Unjust enrichment is a restitutionary claim measured by what this defendant holds. We therefore recommend that Count F be granted as to Zephyrsyne and denied as to Bestova and Embermingle. We acknowledge that this outcome costs Plaintiffs nothing: Counts I, J, and L reach all three, and the conspiracy allegations make each answerable for the whole.

### ***3. Cause of Action H (Intentional Infliction of Emotional Distress)***

Florida recognizes the tort of intentional infliction of emotional distress, but sets the bar for it deliberately high. In *Metropolitan Life Insurance Co. v. McCarson*,

467 So. 2d 277 (Fla. 1985), Justice Ehrlich, writing for the Court, adopted section 46 of the Restatement (Second) of Torts and the commentary that accompanies it. Liability attaches only where the conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 278-79 (quoting Restatement (Second) of Torts § 46 cmt. d (Am. L. Inst. 1965)). The comment the Court adopted is explicit that it "has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice.'" *Id.* at 279.

Two features of the tort control the outcome here. First, whether conduct is outrageous is a question of law for the court, not a question of fact. *Liberty Mut. Ins. Co. v. Steadman*, 968 So. 2d 592, 595 (Fla. Dist. Ct. App. 2007); *Gandy v. Trans World Comput. Tech. Grp.*, 787 So. 2d 116, 119 (Fla. Dist. Ct. App. 2001); *De La Campa v. Grifols Am., Inc.*, 819 So. 2d 940, 943 (Fla. Dist. Ct. App. 2002). The Defaulted Defendants' silence admits the facts pleaded; it does not supply the legal characterization those facts must bear. *See Surtain*, 789 F.3d at 1245. Second, the test is objective, and the plaintiff's own reaction does not control. *Johns Hopkins All Children's Hosp., Inc. v. Kowalski*, 425 So. 3d 645, 673 (Fla. Dist. Ct. App. 2025); *Matsumoto v. Am. Burial & Cremation Servs., Inc.*, 949 So. 2d 1054, 1056 (Fla. Dist. Ct. App. 2006).

Florida courts have repeatedly held conduct not outrageous even while sustaining fraud claims arising from the very same acts. *Gandy* is the clearest illustration: the court reversed the dismissal of a common-law fraud count premised on a promise of permanent employment made with no intention of performing, and in the same breath affirmed dismissal of the intentional infliction count, agreeing "that as a matter of law the alleged conduct was not sufficiently outrageous." 787 So. 2d at 118-19. A federal court applying Florida law reached the same split result in *Golden v. Complete Holdings, Inc.*, 818 F. Supp. 1495, 1499-1500 (M.D. Fla. 1993), sustaining a fraudulent-misrepresentation count while dismissing the outrage count built on the same concealment of "vital financial information." And *McCarson* itself found no outrage where an insurer's termination of nursing-home benefits allegedly precipitated the insured's institutionalization and death. 467 So. 2d at 278-79.

The conduct alleged against the Defaulted Defendants is a financial fraud, pursued for money, executed by misrepresentation. It is serious, it was cruel in its targeting, and it supports judgment under other counts. But it is not, under Florida law, a different species of wrong from the frauds in *Gandy* and *Golden*, and this Court is not free to lower a threshold the Florida Supreme Court has set.

Two further difficulties confirm the result. The count as pleaded is directed at Mega Bank: paragraphs 480 through 488 concern Mega's knowledge and Mega's assistance, and only paragraph 489 extends the theory to the scammers, and then only by asserting that "[f]or these same reasons, the scammers are liable for intentional infliction of emotional distress." [D.E. 72 at ¶¶ 480–89]. That is the

"formulaic recitation of the elements of a cause of action" that *Twombly* forbids. 550 U.S. at 555. And the record contains no evidence of severe distress: the Motion cites "Halabi Decl. at ¶¶ 3, 12–13," [D.E. 133 at 11], but the declaration ends at paragraph 12, and paragraph 12 describes renewed solicitation rather than distress. Finally, whatever the count's merits, it could belong only to Halabi; ALCAD is a corporate entity and cannot suffer emotional distress.

We recommend that Count H be denied. Because Plaintiffs have not moved for emotional distress damages as a liquidated item, [*id.* at 11 & n.6], the recommendation subtracts nothing from the relief otherwise available.

***4. Cause of Action I (Civil Conspiracy)***

Under Florida law, a civil conspiracy requires "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. Dist. Ct. App. 1997); *accord Walters v. Blankenship*, 931 So. 2d 137, 140 (Fla. Dist. Ct. App. 2006).

The claim is not freestanding. "[A]n actionable conspiracy requires an actionable underlying tort or wrong." *Raimi*, 702 So. 2d at 1284; *see Fla. Fern Growers Ass'n v. Concerned Citizens of Putnam Cnty.*, 616 So. 2d 562, 565 (Fla. Dist. Ct. App. 1993). Its office is instead one of attribution: "[c]onspiracy is not a separate or independent tort but is a vehicle for imputing the tortious acts of one coconspirator to another to establish joint and several liability." *Lorillard Tobacco Co. v. Alexander*,

123 So. 3d 67, 80 (Fla. Dist. Ct. App. 2013) (quoting *Ford v. Rowland*, 562 So. 2d 731, 735 n.2 (Fla. Dist. Ct. App. 1990)). That is what makes the count consequential here: it is the mechanism by which Bestova and Embermingle answer for money that only Zephyrsyne received.

The underlying wrongs are supplied by Counts J and K, both of which we recommend be sustained. As to the agreement, the FAC alleges that the Defaulted Defendants were incorporated within six weeks of one another by the same person, at the same virtual address, for no legitimate purpose. [D.E. 72 at ¶¶ 82–99, 104]. Wang opened and controlled their accounts. [*Id.* at ¶¶ 95, 101–03]. And when one route closed (Chase's rejection of the Bestova transfer on June 5, 2024) the scheme redirected Plaintiffs to a different entity's account eight days later. [*Id.* at ¶¶ 105–08]. Agreement is rarely susceptible of direct proof and "may be inferred from the conduct of the participants." *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 950 (11th Cir. 1997). The substitution of one shell for another mid-scheme is conduct from which a common understanding may fairly be inferred.

The overt acts are pleaded in detail: creating and operating the LinusCoins platform, making the misrepresentations through "Carl Roberts," opening and maintaining the receiving accounts, furnishing false invoices and a false warehouse address to the receiving bank, accepting the four transfers, and laundering the proceeds through Dubai and through cryptocurrency exchanges. [*Id.* at ¶¶ 258–61, 318–19, 323, 341, 493–95]. The damage is the $1,505,571.99. We recommend that Count I be granted as to all three Defaulted Defendants.

### *5. Count J (Fraud)*

In Florida, a count for fraudulent misrepresentation has four elements: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in *reliance* on the representation." *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010) (quoting *Johnson v. Davis*, 480 So.2d 625, 627 (Fla.1985) (emphasis added)).

Here, all four elements are present. The Defaulted Defendants' associates held themselves out as legitimate financial professionals and LinusCoins as a functioning cryptocurrency exchange. "Carl Roberts" claimed to have "served as Chief Investment Officer at Goldman Sachs, Merrill Lynch/Delegate Advisors," represented that Plaintiffs' funds could be withdrawn at will, and claimed that the platform was as secure as Kraken. [D.E. 72 at ¶¶ 54, 66(b)–(e), 76, 499]. They knew the representations were false when made; the platform existed for no purpose other than to take money, no trading ever occurred, and the displayed balances and profits were fabricated. [*Id.* at ¶¶ 58, 61–62, 77, 500]. The third element follows from the second: representations of this kind, made to a stranger over WhatsApp with instructions to wire funds abroad, can have had no object but inducement. [*Id.* at ¶ 501]. And Plaintiffs relied, to their detriment, transferring $1,505,571.99 on the strength of fake balances, fabricated trading records, and personal assurances. [*Id.* at ¶¶ 502–04; D.E. 133-1 at ¶¶ 5–9]. Count J should be granted as to all three Defaulted Defendants.

### *6. Count K (Conversion)*

A cause of action for conversion requires a plaintiff to show "an act of dominion wrongfully asserted over [her] property inconsistent with [her] ownership therein." *Warshall v. Price*, 629 So. 2d 903, 904 (Fla. Dist. Ct. App. 1993) (quoting 12 Fla. Jur. 2d Conversion and Replevin § 1 (1979)).

Here, Zephyrsyne wrongfully asserted dominion over Plaintiffs' funds. It received $950,749.99 in four transfers into an account it controlled, retained the money, and wired it onward to Dubai. This conduct was wholly inconsistent with Plaintiffs' ownership. [D.E. 72 at ¶¶ 143, 323, 341, 507–09]. Demand and refusal are not required where, as here, the taking was itself wrongful.

As with Count F, however, the allegations do not support conversion by Bestova or Embermingle of Plaintiffs' property. Bestova's single transfer was rejected and returned; Embermingle received none of Plaintiffs' money; and the 150.25 Ether is not traced to any particular Defaulted Defendant. [*Id.* at ¶¶ 105–07, 257, 305]. We recommend that Count K be granted as to Zephyrsyne and denied as to Bestova and Embermingle, with the understanding that Count I renders all three answerable for the full loss.

### *7. Count L (Breach of Fiduciary Duty)*

Under Florida law, a claim for breach of fiduciary duty requires "the existence of a fiduciary duty, and the breach of that duty such that it is the proximate cause of the plaintiff's damages." *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002). The Defaulted Defendants' associates held themselves out as financial advisors, offered

investment strategy and advice, and encouraged Plaintiffs to entrust them with their funds. [D.E. 72 at ¶¶ 52–78, 510–13]. Plaintiffs reposed trust and confidence in them, and they accepted it. [*Id.* at ¶¶ 465–67, 511]. That relationship created a fiduciary duty, which the Defaulted Defendants breached in the most complete way available—by converting the very funds entrusted to them. [*Id.* at ¶ 514]. Plaintiffs' damages are the direct result. Count L should be granted as to all three Defaulted Defendants.

***8. Count M (Imposition of a Constructive Trust Traceable to Plaintiffs' Stolen Funds and Disgorgement of Funds)***

"A constructive trust is one raised by equity in respect of property which has been acquired by fraud, or where, though acquired originally without fraud, it is against equity that it should be retained by him who holds it." *Quinn v. Phipps*, 93 Fla. 805, 113 So. 419, 422 (1927). Such trusts typically arise after fraud or "some equitable principle independent of the existence of any fraud." *Id.* "[A] constructive trust is a remedial device with dual objectives: to restore property to the rightful owner and to prevent unjust enrichment." *Provence v. Palm Beach Taverns, Inc.*, 676 So. 2d 1022, 1025 (Fla. Dist. Ct. App. 1996) (citing *Abreu v. Amaro*, 534 So. 2d 771 (Fla. Dist. Ct. App. 1988)). Florida courts will impose a constructive trust only upon a showing of "(1) a promise, express or implied, (2) transfer of the property and reliance thereon, (3) a confidential relationship and (4) unjust enrichment." *Id.* (citing *Abreu*, 534 So. 2d at 772).

We have already found that fraud and unjust enrichment are sufficiently pleaded. The remaining element requiring comment is the promise, which the FAC pleads both expressly, [D.E. 72 at ¶ 66(h)], and impliedly, through the Defaulted

Defendants' conduct and their targeting of Halabi. The conditions surrounding this case therefore satisfy the requirements for a constructive trust.

Two limitations warrant mention. A constructive trust must attach to specific, identifiable property traceable to the plaintiff. *See Provence*, 676 So. 2d at 1025. The FAC traces much of the cryptocurrency through layering and peel-chain transactions to deposit addresses at named exchanges, [D.E. 72 at ¶¶ 258–61, 519], but concedes that transfers 6, 11, and 12 "have not been fully traceable so far," [*id.* at ¶¶ 267, 270], and the wired funds were withdrawn before the Zephyrsyne account closed in August 2024, [*id.* at ¶¶ 138, 374]. The remedy can reach only what remains traceable. Second, a constructive trust must be established by clear and convincing evidence, *Provence*, 676 So. 2d at 1025, a standard the present record does not attempt to meet as to any particular asset.

We therefore recommend that Plaintiffs' entitlement to a constructive trust be recognized in principle, but that its imposition await an appropriate motion identifying the specific property to be impressed.

### *E. __Calculation of Damages__*

#### *1. Plaintiffs' compensatory damages*

Plaintiffs' losses took two forms: wire transfers and cryptocurrency transfers. Four wires were completed. On June 14, 2024, Halabi transferred $250,249.99 from her personal Wells Fargo account; on June 24, 2024, ALCAD wired $200,000.00 from its Banco Sabadell account; on July 1, 2024, ALCAD wired $200,200.00; and on July 5, 2024, ALCAD wired $300,300.00. [D.E. 133-1 at ¶¶ 6–7]. Those transfers total

$950,749.99. Separately, between May and September 2024, Halabi made fifteen cryptocurrency transfers totaling 150.25 Ether, valued at approximately $554,822.00 at the time of transfer. [*Id.* at ¶ 8]. The aggregate compensatory loss is $1,505,571.99. [*Id.* at ¶ 9]. The record supports that figure without an evidentiary hearing. *See SEC v. Smyth*, 420 F.3d at 1232 n.13; *Adolph Coors*, 777 F.2d at 1544. The Halabi Declaration, which is sworn and itemized, supports the figures, and we adopt them. We use the value at the time of transfer, which is the ordinary measure for conversion and for RICO injury.

### *2. RICO treble damages*

Section 1964(c) entitles a prevailing RICO plaintiff to recover "threefold the damages he sustains." Trebling $1,505,571.99 yields $4,516,715.97, the figure the Motion requests. [D.E. 133 at 11].

That award is not available yet. For the reasons given above, we recommend that the Court defer ruling on Counts A through D pending supplemental briefing on continuity. Treble damages, and the mandatory fee award that § 1964(c) carries with it, rise and fall with those counts. We therefore recommend that the trebled figure be neither awarded nor denied at this time.

### *3. Plaintiffs Are Entitled to One Satisfaction*

A word is warranted about the relationship among the counts, because the Motion asks for judgment on all of them without saying how the awards interact. [D.E. 133 at 14]. Counts F, I, J, K, and L all *see*k compensation for the same $1,505,571.99. They are alternative theories of recovery for a single injury, not

cumulative ones, and Plaintiffs are entitled to be made whole once. Should the Court ultimately enter judgment on the RICO counts, the trebled award of $4,516,715.97 would subsume the compensatory recovery available under the state law counts rather than add to it, and Plaintiffs would recover $4,516,715.97 in total—not that sum plus $1,505,571.99. If the RICO counts do not survive, the compensatory recovery is $1,505,571.99. Either way, the state law counts serve to establish liability and to reach defendants the RICO counts might not; they do not multiply the recovery.

#### *4. Emotional Distress Damages*

No award is recommended. Although the Motion's prayer requests emotional distress damages, [D.E. 133 at 14], its damages section submits only "liquidated damages" and expressly characterizes emotional pain and suffering as non-liquidated, [*id.* at 11 & n.6]. Plaintiffs have offered no evidence quantifying such damages, and we have recommended that Count H be denied. Nothing in this Report forecloses a properly supported request should Count H be revived.

#### *5. Punitive Damages*

No award is recommended, for much the same reason. The FAC pleads punitive damages, [D.E. 72 at ¶¶ 523–27], and the Motion's prayer requests them, [D.E. 133 at 14], but the damages section submits no evidence and offers no argument addressed to the standard under Fla. Stat. § 768.72. Damages may be awarded on default only where "the record adequately reflects the basis for [the] award." *Adolph Coors*, 777 F.2d at 1544. It does not here.

### *6. Prejudgment Interest, Attorneys' Fees and Costs Pursuant to 18 U.S.C. § 1964(c)*

*(a) Prejudgment interest.*

Florida follows the "loss theory": once a fixed sum of pecuniary loss and a date of loss are established, "computation of prejudgment interest is merely a mathematical computation," and awarding it is "a purely ministerial duty." *Argonaut Ins. Co. v. May Plumbing Co.*, 474 So. 2d 212, 215 (Fla. 1985) (Ehrlich, J.). Neither the merit of a defense nor the certainty of the amount affects entitlement. *Id.* Where no rate is contracted for, the applicable rate is the one set under Fla. Stat. § 55.03, *see* Fla. Stat. § 687.01, which the Chief Financial Officer adjusts quarterly, *see* Fla. Stat. § 55.03.

Applying the successive quarterly rates from each date of loss through August 19, 2026 yields the following, computed on the compensatory loss before any trebling:

| Loss | Date of loss | Principal | Interest |
|---|---|---|---|
| Wells Fargo wire | June 14, 2024 | $250,249.99 | $48,732.93 |
| Sabadell wire | June 24, 2024 | $200,000.00 | $38,435.62 |
| Sabadell wire | July 1, 2024 | $200,200.00 | $38,115.45 |
| Sabadell wire | July 5, 2024 | $300,300.00 | $56,861.85 |
| 150.25 Ether (15 transfers) | Sept. 30, 2024 | $554,822.00 | $92,545.22 |
| **Total** | | **$1,505,571.99** | **$274,691.07** |

Two notes on the computation. The cryptocurrency transfers are pleaded only as occurring "[b]etween May and September 2024," [D.E. 133-1 at ¶ 8], without individual dates, and *Argonaut* requires a date certain. *See* 474 So. 2d at 215. We have used September 30, 2024—the last day of the pleaded range—which is the date

least favorable to Plaintiffs and therefore the one no defendant could contest. Plaintiffs may supplement with the fifteen transaction dates, which would increase the figure. And because the rate changes each quarter, the total must be updated to the actual date of judgment; at the rate in effect for the third quarter of 2026 (8.06%), *see* Fla. Dep't of Fin. Serv., Current Judgment Interest Rates (https://myfloridacfo.com/division/aa/audits-reports/judgment-interest-rates), interest accrues at $332.46 per day on the aggregate principal.

If the Court ultimately enters judgment on the RICO counts, prejudgment interest should be computed on the compensatory loss and not on the trebled award. *See Allstate Ins. Co. v. Palterovich*, 653 F. Supp. 2d 1306, 1333 (S.D. Fla. 2009) ("To treble the amount of prejudgment interest awarded would therefore result in an unfair windfall to Plaintiffs."). Whether to award prejudgment interest on a federal RICO claim at all is committed to the Court's discretion. *See id.* at 1327–28 (citing *Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1446 (11th Cir. 1998)).

*(b) Attorney's fees and costs.*

Section 1964(c) provides that a prevailing plaintiff "shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." The award is mandatory rather than discretionary—but it is mandatory only for a plaintiff who prevails on a RICO claim, and the RICO counts are not yet resolved. We therefore recommend that entitlement to fees and costs be deferred along with Counts A through D. Plaintiffs have reserved the right to move for fees following entry of

judgment, [D.E. 133 at 11], and any such motion should comply with Federal Rule of Civil Procedure 54(d)(2) and Southern District of Florida Local Rule 7.3.

## *IV. CONCLUSION*

For the foregoing reasons, the Court **RECOMMENDS** that Plaintiffs' Motion for Deferred Final Default Judgment [D.E. 133] be **GRANTED** in part, **DENIED** in part, and **DEFERRED** in part, as follows:

1. The Clerk's entries of default against Zephyrsyne Limited, Embermingle Limited, and Bestova Trading Limited [D.E. 129] should be **MAINTAINED**.

2. Default judgment on liability should be **ENTERED** against all three Defaulted Defendants on Count I (Civil Conspiracy), Count J (Fraud), and Count L (Breach of Fiduciary Duty).

3. Default judgment on liability should be **ENTERED** against Zephyrsyne Limited only on Count F (Unjust Enrichment) and Count K (Conversion), and those counts should be **DENIED** as to Embermingle Limited and Bestova Trading Limited.

4. Count H (Intentional Infliction of Emotional Distress) should be **DENIED** as to all three Defaulted Defendants.

5. Plaintiffs' entitlement to a constructive trust under Count M should be **RECOGNIZED**, with imposition **DEFERRED** pending a motion identifying the specific traceable property to be impressed.

6. Ruling on Counts A, B, C, and D (RICO and RICO conspiracy) should be **DEFERRED**. Plaintiffs may file, within fourteen (14) days, a supplemental memorandum addressing closed-ended and open-ended continuity as to the Scammer

Enterprise and the effect of the Court's Report and Recommendation and Dismissal Order on that question.

7. Compensatory damages should be **FIXED** at $1,505,571.99, in favor of Plaintiffs jointly, with the allocation between Carmen A. Halabi and ALCAD 1737, Ltd. **RESERVED**.

8. Prejudgment interest should be **AWARDED** under Fla. Stat. §§ 55.03 and 687.01 in the amount of $274,691.07 through August 19, 2026, to be updated to the date of judgment at $332.46 per day.

9. Treble damages and attorney's fees under 18 U.S.C. § 1964(c) should be **DEFERRED** pending resolution of Counts A through D. Emotional distress damages and punitive damages should be **DENIED** and not awarded on this record.

10. Entry of final judgment should be **DEFERRED** until Counts A through D are resolved, consistent with the relief Plaintiffs themselves requested. [D.E. 133 at 12–14].

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the parties have fourteen (14) days from service of this Report and Recommendation within which to file written objections, if any, with the District Judge. Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report. 28 U.S.C. § 636(b)(1); 11th Cir. R. 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner*

*of Social Security,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE and SUBMITTED** in Chambers at Miami, Florida this 2d day of September, 2026.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge